FILED

MAY 2 0 2003

DAVID W. DANIEL, CLERK
US DISTRICT COURT, EDNC
BY_____ DEP. CLERK

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:03-CV-372 - BO

| | |
|---|---|
| eGENERAL MEDICAL, INC., HOWELL AUTOMOTIVE and DIRECT FOREIGN EXCHANGE PLC, on behalf of themselves and all others similarly situated, ) ) ) ) ) | CLASS ACTION COMPLAINT |
| Plaintiffs, ) ) | |
| v. ) ) | |
| VISA U.S.A., INC., MASTERCARD INTERNATIONAL, INC., AMERICAN EXPRESS COMPANY and DISCOVER FINANCIAL SERVICES, INC., and all similarly situated financial institutions, ) ) ) ) ) ) | |
| Defendants. ) ) | |

Plaintiffs eGENERAL MEDICAL, INC., DIRECT FOREIGN EXCHANGE PLC and

HOWELL AUTOMOTIVE (collectively, "**Named Plaintiffs**"), by and through their attorney

Mark W. Ishman, bring this Class Action Complaint against Defendants VISA U.S.A., INC.,

MASTERCARD INTERNATIONAL, INC., AMERICAN EXPRESS and DISCOVER

(collectively, "**Defendants**") and allege upon personal knowledge as to themselves and their own

acts, and upon information and belief with respect as to all other matters, as to which allegations

they believe substantial evidentiary support will exist after a reasonable opportunity for further

investigation and discovery as more fully explained as follows:

## I. INTRODUCTION

1.      Named Plaintiffs and members of the Class (as defined below) (collectively, "**Plaintiffs**") are merchants who own and operate thousands of telephone/mail order and Internet stores throughout the United Sates. Similar to more than three million United States "brick and mortar" merchants, Plaintiffs accept Visa, MasterCard, American Express and Discover credit and debit cards as a form of payment along with cash, checks, travelers checks and other plastic credit and debit cards. Despite the various methods of payment offered by Plaintiffs, it is estimated that over 96% of the sale orders that Plaintiffs process use Visa, MasterCard, American Express and Discover credit and debit cards as the form of payment. Therefore, in order to operate successfully, Plaintiffs must be able to accept Visa, MasterCard, American Express and Discover credit and debit cards as a form of payment.

2.      As a condition of being able to accept Visa, MasterCard, American Express and Discover as a form of payment, Defendants require Plaintiffs to enter into a merchant agreement. Under this merchant agreement, Plaintiffs must comply with the rules and regulations of Defendants. However, despite numerous attempts to obtain a copy of such rules and regulations, Plaintiffs have never received or seen a copy of them. As a result of these undisclosed penalty fees, Defendants have attempted to justify millions of dollars debited from Plaintiffs' accounts. These penalty fees were never disclosed to Plaintiffs at the time of entering into their respective merchant agreement.

3.      Defendants also require Plaintiffs to pay higher transactional and penalty fees than "brick and mortar" merchants. Many of these higher transactional and penalty fees are only stated in Defendants' rules and regulations, and therefore were undisclosed to Plaintiffs when they entered into their respective merchant agreement. As a result of these higher transactional

and penalty fees, Defendants have attempted to justify millions of dollars debited from Plaintiffs'
accounts because Plaintiffs industry, the telephone/mail order and Internet industries (the
"**Industry**"), experiences a higher rate of fraud.

4.      Additionally, and unlike their requirements for "brick and mortar" merchants,
Defendants require Plaintiffs to perform additional cardholder authentication procedures before
Plaintiffs can accept credit and debit card sale orders because their Industry experiences a higher
rate of fraud.  As a result of these additional authentication requirements, Plaintiffs have spent
millions of dollars each year complying and exceeding these requirements.

5.      However, Defendants rationale for their excessive transactional and penalty fees
and authentication requirements are belied in the fact that Defendants claim no responsibility for
credit card fraud.

6.      Plaintiffs on behalf of themselves and all similarly situated merchants in the
Industry, who accept Visa, MasterCard, American Express and Discover credit and debit cards as
a form of payment, are forced to accept Defendants' transactional and penalty fees as well as
comply with Defendants' authentication requirements, challenge these fees and requirements
under federal and state law.  These fees and requirements along with Defendants' claim of no
responsibility for credit card fraud, force merchants in the Industry to substantially pay for all
fraudulent credit card activity in the Industry.

7.      As more fully explained below, Plaintiffs seek declaratory and injunctive relief,
and seek damages to redress these violations of federal and state law.  Immediate judicial redress
is necessary to remedy the substantial injustice Defendants have created and to prevent further
irreparable harm.

## II.    *JURISDICTION AND VENUE*

8.    This Complaint is filed under Section 1961 of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1962(c) and (d)) ("**RICO**"), Section 16 of the Clayton Act (15 U.S.C. § 26), Section 2(a) of the Robinson-Patman Act (15 U.S.C. § 13) and other unlawful business practice violations, and for damages under Section 1964 of RICO (18 U.S.C. §§ 1964(c), Section 4 of the Clayton Act (15 U.S.C. § 15) and related state law claims for relief for injuries to the business and property of Plaintiffs proximately caused by Defendants' RICO, antitrust and other unlawful business practice violations.

9.    This Court has jurisdiction of such federal and state claims alleged herein under 28 U.S.C. §§ 1331 (Federal Question), 1367 (Supplemental Jurisdiction), and 2201 (Declaratory Judgment Act), 18 U. S.C. §§ 1964(a) and (c) (RICO) and 15 U.S.C. § 15 (Clayton Act).

10.    Defendants transact business and are found in this District.  In particular, tens of thousands of merchants located in this District accept Defendants' credit and debit cards and are forced to comply with Defendants' rules and regulations in order to be able to accept their respective credit and debit cards as a form of payment.  Hundreds of bank members of Defendants are located in this District issue and/or "acquire" merchant transactions for Defendants' credit and debit cards. The interstate trade and commerce involved and affected by the alleged violations of RICO and antitrust laws were and are carried on in part within this District.   The acts complained of have had, and will have, substantial racketeering and anticompetitive effects in this District.  Defendants have committed substantial acts here in furtherance of their conspiracy and monopoly.  Named Plaintiffs and countless like merchants who are members of this Class (as defined below) own and operate companies in this District. Venue in this District is proper under 18 U.S.C. § 1965, 28 U.S.C. § 1391 and 15 U.S.C. § 22.

## III. THE PARTIES

**A.** **Plaintiffs**

11.     Plaintiff eGENERAL MEDICAL, INC.   ("**eGeneral Medical**") is a North Carolina corporation with its principal place of business at 8384 Six Forks Road Unit 201, Raleigh, North Carolina.   eGeneral Medical is an Internet (www.egeneralmedical.com) and telephone/mail order corporation that began utilizing the credit and debit card services of Defendants in 2000, and has utilized their services for such use since that time until the present.

12.     Plaintiff HOWELL AUTOMOTIVE ("**Howell Automotive**") is a West Virginia partnership with its principal place of business at 3 Mopar Place, Route 46 East, Keyser, West Virginia.   Howell Automotive is an Internet (www.howellautomotive.com) and telephone/mail order company that began utilizing the credit and debit card services of Defendants in 1994, and has utilized their services for such use since that time until the present.

13.     Plaintiff DIRECT FOREIGN EXCHANGE PLC ("**DIRECT FX**") is a New York foreign business corporation with its principal place of business at 17th Floor, 11 East 44th Street, New York, New York.   Direct FX is an Internet (www.foreign-currency.com) and telephone/mail order corporation that began utilizing the credit and debit card services of Defendants in 2000, and has utilized their services for such use since that time until the present.

**B.** **Defendants**

14.     Defendant VISA U.S.A., INC. ("**Visa**") is a Delaware corporation with its principal place of business at San Francisco, California.  Visa is a national bank card association whose members include more than 21,000 banks.  At times pertinent to this Complaint, Visa, individually and through its agents, alter egos, subsidiaries, divisions, or parent companies, materially participated in the Enterprise, and materially participated, conspired, assisted,

encouraged, and otherwise aided and abetted one or more of the other Defendants in the unlawful, misleading, and fraudulent conduct alleged herein, and has affected foreign and interstate commerce in the United States, including the state of North Carolina. Visa is doing business and transacts business in this judicial district.

15.    Defendant MASTERCARD INTERNATIONAL, INC. ("**MasterCard**") is a Delaware corporation with its principal place of business at Purchase, New York. MasterCard is a national bank card association whose members include more than 25,000 banks. At times pertinent to this Complaint, MasterCard, individually and through its agents, alter egos, subsidiaries, divisions, or parent companies, materially participated in the Enterprise, and materially participated, conspired, assisted, encouraged, and otherwise aided and abetted one or more of the other Defendants in the unlawful, misleading, and fraudulent conduct alleged herein, and has affected foreign and interstate commerce in the United States, including the state of North Carolina. MasterCard is doing business and transacts business in this judicial district.

16.    Defendant AMERICAN EXPRESS COMPANY ("**American Express**") is a New York corporation with its principal place of business at New York, New York. American Express is "primarily engaged in the business of providing travel related services, financial advisory services and international banking services throughout the world." At times pertinent to this Complaint, American Express, individually and through its agents, alter egos, subsidiaries, divisions, or parent companies, materially participated in the Enterprise, and materially participated, conspired, assisted, encouraged, and otherwise aided and abetted one or more of the other Defendants in the unlawful, misleading, and fraudulent conduct alleged herein, and has affected foreign and interstate commerce in the United States, including the state of North Carolina. American Express is doing business and transacts business in this judicial district.

17.     Defendant DISCOVER FINANCIAL SERVICES, INC. ("**Discover**") is an Illinois corporation with its principal place of business at Riverwoods, Illinois. Discover is " the largest independent credit card network in the United States." At times pertinent to this Complaint, Discover, individually and through its agents, alter egos, subsidiaries, divisions, or parent companies, materially participated in the Enterprise, and materially participated, conspired, assisted, encouraged, and otherwise aided and abetted one or more of the other Defendants in the unlawful, misleading, and fraudulent conduct alleged herein, and has affected foreign and interstate commerce in the United States, including the state of North Carolina. Discover is doing business and transacts business in this judicial district.

**C.     Co-Conspirators**

18.     Various persons, firms, corporations, organizations and other business entities, some unknown and others known, have participated as co-conspirators in the violations alleged and have performed acts in furtherance of the conspiracies and anticompetitive business practices ("**Co-Conspirators**"). Co-conspirators whose identities are presently known include, but are not limited to, over 46,000 member financial institutions that have issued Defendants' credit and debit cards or acquired retail merchant transactions for Defendants' credit and debit cards, including Defendants' Acquiring, Issuing and Processing Banks, and have received direct financial benefit from the distribution among Defendants' members of the fees, fines and other charges collected unlawfully by Defendants from merchants pursuant to its illegal conspiracy and anticompetitive business practices are co-conspirators.

### IV.     CLASS ACTION ALLEGATIONS

19.     Plaintiffs bring this action on behalf of themselves, and under Rules 23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, as representatives of all merchants in

the Industry as of the filing of this Complaint, who are or were parties of a merchant agreement with Defendants or Co-Conspirators (collectively, the "**Class**"). The Class does not include the named Defendants, their directors, officers or members of their families.

20.     Defendants' activities have harmed and continue to harm the interests of the vast majority of the merchants in the Industry located throughout the United States. The members of the Class are so numerous that joinder of all members is impracticable.

21.     Defendants' relationship with the members of the Class and Defendants' activities with respect to members of the Class have been substantially uniform. Questions of law and fact will predominately be common to the members of the Class.

22.     Plaintiffs have no conflicts with members of the Class and have retained counsel with expertise in the Industry and competent in federal class action, RICO and antitrust litigation. Plaintiffs and their counsel will fairly and adequately represent the interests of the Class.

23.     Defendants have acted, continue to act and continue to refuse to act on grounds generally applicable to the members of the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

24.     This action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all members is not only impracticable, but also impossible. The damages suffered by certain members of the Class are small in relation to the expense and burden of individual litigation, and therefore it is highly impractical for such members of the Class to attempt redress of the wrongful racketeering and antitrust activity individually. There will be no extraordinary difficulty in the management of this class action lawsuit. Common questions of law and fact exist with respect to all members of the Class and predominate over any questions solely affecting individual members. Among the questions of law and fact

common to the members of the Class, many of which cannot be seriously disputed, are the following:

(a)     Whether Defendants conspired to misrepresent and/or conceal their penalty fees debited to members of the Class' merchant accounts in fraudulent credit and debit card transactions?

(b)     Whether Defendants conspired to debit unenforceable transactional and Chargeback Fees to members of the Class' merchant accounts?

(c)     Whether Visa and MasterCard and their Co-Conspirators' contract, combination, conspiracy and agreement for taking zero responsibility and accountability for fraud in the Industry for "card not present" transactions are per se unlawful because Visa, MasterCard and their Co-Conspirators possess and exercise market power, economic power sufficient to make forcing probable, or monopoly power in the markets alleged in this Complaint?

(d)     Whether Visa and MasterCard and their Co-Conspirators' contract, combination, conspiracy and agreement for discriminating in their pricing to members of the Class are per se unlawful because Visa, MasterCard and their Co-Conspirators possess and exercise market power, economic power sufficient to make forcing probable, or monopoly power in the markets alleged in this Complaint?

(e)     The amount of transactional and penalty fees and other Visa and MasterCard mandated fees and assessments that members of the Class have been forced to pay for Visa and MasterCard transactions, which they neither sought nor willingly accepted?

(f)     Whether Defendants conspired to breach or breached their duty to exercise ordinary care in failing to act seasonably in the presentment and notice of dishonor or non-payment of a credit or debit card transaction to members of the Class?

(g)    Whether Defendants conspired to breach or breached their fiduciary duty to act and give advice for the benefit of the members of the Class in the presentment and notice of dishonor or non-payment of a credit or debit card transaction to members of the Class?

(h)    Whether Defendants conspired to breach or breached their duty to exercise ordinary care, fiduciary duty to act or implied covenant of good faith and fair dealing by failing to disclose knowledge to their members or members of the Class that certain credit and debit cards were compromised by means of theft, security breach, computer hacking or otherwise?

(i)    Whether Defendants conspired to breach or breached their duty to exercise ordinary care, fiduciary duty to act or implied covenant of good faith and fair dealing by failing to cancel and reissue credit and debit cards when their cardholders' credit and debit cards were stolen?

(j)    Whether Defendants conspired to breach or breached their duty to exercise ordinary care, fiduciary duty to act or implied covenant of good faith and fair dealing by failing to require their cardholders to return merchandise before debiting members of the Class' merchant account for a Chargeback Fees, or alternatively, by failing to put such disputed funds in escrow until disputes are resolved?

(k)    Whether Defendants have conspired with their Co-Conspirators to debit from members of the Class' merchant accounts Chargeback Fees when such fees were not appropriate, justified or warranted?

(l)    Whether Defendants have conspired to breach or breached their duty to exercise ordinary care, fiduciary duty to act or implied covenant of good faith and fair dealing by miscalculating Chargeback Fees on CVV2 and AVS authenticated transactions?

(m)     Whether Defendants have conspired to breach or breached their implied covenant of good faith and fair dealing by failing to take precautions to avoid consumer fraud in credit card transactions conducted in the Industry?

(n)     Whether Defendants have conspired to breach or breached their duty to exercise ordinary care, fiduciary duty to act or implied covenant of good faith and fair dealing by failing to develop standards and procedures for authentication and verification of credit and debit card transaction conducted in the Industry?

(o)     Whether Defendants conspired with their members to create and/or process Chargeback Fees to members of the Class in order to levy significant fines in situations where a Chargeback Fee are not justified or warranted?

(p)     Whether Defendants conspired to unlawfully debit members of the Class' merchant accounts and knowingly obtaining members of the Class' property with intent to, either temporarily or permanently, deprive members of the Class of their rights to such funds, or alternatively, by debiting members of the Class' merchant account through the imposition of penalties under Defendants' rules and regulations?

(q)     Whether Defendants conspired with their members to issue penalties and fines under their rules and regulations amounting to unconscionable acts and practices and unfair, deceptive or negligent acts?

(r)     Whether Defendants conspired with their members to require members of the Class to enter into an adhesion contract in order to be able to accept Visa or MasterCard as a form of payment?

(s)     Whether Defendants' activities and the entities that they formed to assist in pursuing their objectives constitute an "**Enterprise**" within the meaning of 18 U.S.C. § 1961(4)?;

(t)     What is the operative time period of the agreement, combination, conspiracy and common course of conduct?

(u)     Whether Defendants acted or refused to act on grounds generally applicable to the Class and whether the association, combination, conspiracy and common course of conduct are continuing, thus entitling the Class to injunctive relief?; and

(v)     Whether Defendants fraudulently concealed their conspiratorial activities?

## V.     GENERAL ALLEGATIONS

25.     Credit card fraud in the Industry is a serious problem, and is estimated to total 9 million dollars in 2001 (see Meridian Research report). The following Celent Communications, January 2003, table provides the percentages of how credit card fraud in conduct in the Industry:

| Type of Fraud | Percentage |
|---|---|
| Lost or stolen credit card | 48% |
| Identity theft | 15% |
| Skimming (or cloning) | 14% |
| Counterfeit card | 12% |
| Mail Intercept Fraud | 6% |
| Other | 5% |

26.     Much as been made of threats to consumer security and vulnerability in the Industry, but the fact is that United States consumers face little risk because federal law caps their liability for unauthorized charges on credit card transaction at fifty dollars ($50.00).

27.     Defendants have exploited consumers' fear of fraud by protection schemes that afford little, if any, extra protection than what the law currently provides to them.

28.     Defendants also take no responsibility for fraudulent transactions in the Industry. Defendants have the leverage to make such a claim because they control over 96% of the credit card transactions in the Industry.

29.     As a result of this rapidly growing credit card fraud problem, and Defendants failure to act and acknowledge their responsibility with credit card fraud, Plaintiffs bear substantially all the risks associated with credit card fraud in the Industry.

## A.     The Credit Card Transaction

30.     Credit Card transactions essentially involve four parties:  (1) the customer cardholder who makes the purchase; (2) the merchant who receives funds for goods or services provided; (3) the credit card processor which funds the merchant; and (4) the issuing bank which receives payment from the cardholder and in turn funds the processor.

31.     A credit card transaction occurs through the wiring of funds to the corresponding parties in the transaction and mailing transactional documents to the participating parties.

## B.     Defendants' Monopoly Power

32.     Defendants, through their member banks, issue a wide variety of "plastic" payment cards, including credit and debit cards.  In 2002, Visa has reported that it has more than 1 billion cards in circulation worldwide, and MasterCard has reported that it has more than 590 million cards in circulation worldwide.  Also in 2002, Visa has reported more than 1.8 trillion products and services were purchased using its cards, and MasterCard has reported more that 13.6 billion transactions were purchased using its cards.  Today, Visa's share of the general-purpose credit and debit card market is nearly 60 percent, and MasterCard's share of the general purpose credit and debit card market is 33 to 36 percent.

33.     Some Co-Conspirators are member banks of Defendants who are card-issuing institutions, rather than Defendants themselves, that issue credit and debit cards to consumers and set the cardholders' interest rates and fees ("**Issuing Banks**"). Other Co-Conspirators are member banks that are acquiring institutions, that contract on behalf of Visa and MasterCard with retailers to accept their credit and debit cards ("**Acquiring Banks**"). When a cardholder makes a purchase with his or her Visa or MasterCard credit or debit card at a merchant's store, the acquiring institution reimburses the merchant the purchase price less a "discount fee" (*e.g.*, 2.5%) and the acquiring institution pays the card-issuing institution an "interchange fee" (*e.g.*, $.25 per transaction). Visa and MasterCard set the interchange fee, and the discount fee is based largely on the interchange fee.

34.     Visa and MasterCard have a policy of duality, whereby there is a high degree of uniformity in both the interest rates and fees charged by member banks of Visa and MasterCard to cardholders and in the discount rates charged by member banks of Visa and MasterCard to merchants accepting Visa and MasterCard payment cards.

35.     The United States District Court for the Southern District of New York has provided precedent on Visa and MasterCard anticompetitive business practices in United States of America v. VISA U.S.A., Inc., et al., 163 F. Supp.2d 322 (S.D.N.Y. 2001) by noting that "Visa and MasterCard are able to charge substantially different prices for those hundreds of thousands of merchants (Internet, telephone and mail order merchants) who must take credit and debit cards at any price because their customers insist on using those cards."

### C.     Plaintiffs Reliance on Credit and debit cards

36.     Plaintiffs rely almost completely on Defendants' credit and debit cards. Defendants charge a higher interchange fee to Plaintiffs than they do to "brick and mortar"

merchants. Such fees for Plaintiffs are typically two to five percent (2% - 5%) higher than "brick and mortar" merchants.

37.     Defendants are able to charge substantially different prices to merchants in the Industry because such merchants must accept credit and debit cards at any price because their customers insisting on using those cards because it is their only practical form of payment.

### D.     The Merchant Agreement

38.     Plaintiffs entered into a Merchant Processing Agreement ("**Merchant Agreement**") with Defendants, through their member banks, pursuant to which Plaintiffs agreed, *inter alia*, to honor credit and debit card transactions from customers and Defendants, and their member banks, agreed, *inter alia*, to accept all sales drafts generated in compliance with the Merchant Agreement and deposited by Plaintiffs.[1]  A copy of a Merchant Agreement is attached hereto as Exhibit A.

39.     Each Merchant Agreement is expressly subject to the "bylaws, rules and regulations promulgated" by each corresponding Defendant.   Nevertheless, and despite their repeated written demands, Plaintiffs have never been provided with a copy for, or been given access to, such rules and regulations.

### E.     Defendants Fees

40.     Upon information and belief, credit card processors and issuing banks were required to become a "Member" by entering into one or more agreements with Defendants in order to be able to enter into merchant processing agreements (such as the ones at issue).  As a

---

[1]      In general, a Merchant Account is a bank account in which funds are collected by a bank from credit card purchasers and disbursed to the merchant. Banks consider Merchant Accounts to be a 'loan' and underwrite the issuance of a Merchant Account much like a loan, requiring an application, supporting documentation like tax returns, acceptable products/services and good credit. Merchant processing agreements allow for consumer credit card transactions to take place.

member of one of the Defendants, such credit card processors and issuing banks act as an agent of Defendants with respect to the processing of credit and debit card transactions.

41.     Defendants, through their Co-Conspirators, charge Plaintiffs a percentage of each sale (2-5%) as a processing fee. Many Plaintiffs have to pay a higher fee because Defendants' and their Co-Conspirators have classified their businesses as "high risk". Defendants, through their Co-Conspirators, also charge Plaintiffs a transaction fee (25¢-50¢) for each attempted purchase, even if no sale is completed.

42.     Typically, Defendants' credit card processing banks are institutions separate from and independent of the banks issuing the merchant account to Plaintiffs, or Defendants' credit card processing banks may be a stand-alone institution providing both the merchant account and processing services to Plaintiffs.

43.     Moreover, if a cardholder later rejects a transaction with a Plaintiff for a specific reason, such as a cardholder dispute or fraud, then Defendants, through their Acquiring Banks, will return the transaction, *i.e.*, "chargeback[2]," to Plaintiffs who must accept a Chargeback Fee ("**Chargeback Fee**") unless the transaction can be successfully re-presented to Defendants, through their Issuing Bank. A Chargeback Fee can range from $15 to $150. However, Plaintiffs in the Industry rarely are successful re-presenting the transaction to the Issuing Bank because the Issuing Bank allows the cardholder several opportunities to dispute the transaction, and Defendants admit that there are no set methods or required facts, *e.g.*, a signed contract or a signed mailing receipt, that a merchant must argue to successfully dispute a cardholder's claim

---

[2]     A Chargeback is a processed bankcard transaction that is later rejected and returned to the Acquirer by the Issuer for a specific reason, such as a cardholder dispute or fraud. The Acquirer may then return the transaction to the merchant that may have to accept the dollar loss unless the transaction can be successfully re-presented to the Issuer.

that a purchase was not made. Thus, Plaintiffs generally are not able to reverse a Chargeback Fee.

44.     In Chargeback Fees alone, Defendants have made millions of dollars from Plaintiffs.

45.     For example, in 2000, Plaintiffs estimate that Defendants made at least $55,604,940 dollars in Chargeback Fees. This estimate is based on the following data reported by Ernst & Young and Visa utilizing the formula listed below:

| | |
|---|---|
| Annual online retail sales: | $38,800,000,000 |
| Percentage of Sale by Credit Card: | 95% |
| Average Sales Ticket Online: | $70 |
| Lowest online fraud rate estimate: | 2.64% |
| Average online Chargeback Fee: | $40 |

$38.800,000,000 x 95% = $36,860,000,000 *dollars in online credit card sales*
$36,860,000,000 / $70 = $526,571,420 *dollars in total transactions*
$526,571,420 x 2.64% = $13,901,485 *dollars in online fraud*
$13,901,485 x $40 = $55,604,940 *dollars in revenues for Defendants*

46.     In 2001, Plaintiffs estimate that Defendants made at least $383,453,700 dollars in Chargeback Fees. This estimate is based on the following data reported by GartnerG2 utilizing the formula listed below:

| | |
|---|---|
| Annual online retail sales: | $61,800,000,000 |
| Percentage of Sale by Credit Card: | 95% |
| Average Sales Ticket Online: | $70 |
| Lowest Online Fraud rate estimate: | 1.14% |
| Average online Chargeback Fee: | $40 |

$61,800,000,000 x 95% = $58,710,000,000 *dollars in online credit card sales*
$58,710,000,000 / $70 = $838,714,280 *dollars in total transactions*
$838,714,280 x 1.14% = $9,561,342 *dollars in online fraud*
$9,561,342 x $40 = $383,453,700 *dollars in revenues for Defendants*

47.    Yet, with all the above-mentioned fees, including higher transactional fees for Plaintiffs, Defendants claim that they have no responsibility for any unauthorized charges or fraudulent use of their credit and debit cards.

**F.    Processing Transactions Under the Merchant Agreement**

48.    After entering into the Merchant Agreement, Plaintiffs began processing credit and debit card transactions through Defendants' respective issuing bank.

49.    Transactions in the Industry involve three core processing transactions: (i) Authorization, which takes place at the time the transaction occurs (It is the process by which an Issuer approves (or declines) a card purchase); (ii) Authentication, which involves the verification of the cardholder and the card (At the time of authorization, to the greatest extent possible, the e-commerce merchant should use fraud prevention controls and tools to validate the cardholder's identity and the card being used); and (iii) Settlement, which once a product/service has been shipped or delivered to the customer, the merchant can initiate the settlement or a transaction through their Acquirer and trigger the transfer of funds into the merchant account).

**G.    Authenticating Transactions in the Industry**

50.    In order to prevent credit card fraud, Defendants require that Plaintiffs implement authentication procedures known as Card Verification Value 2 (CVV2)[3] and Address Verification Service (AVS)[4]. Plaintiffs understood that all Defendants' issuing banks were required to authenticate all charges under CVV2 and AVS thereby eliminating Chargeback Fees

---

[3]    CVV2 is a three-digit value that is printed on the back of a credit card, which provides a cryptographic check of the information embossed on a card, and assures the merchant, Acquirer and Issuer that the card is valid. The CVV2 is housed in the signature panel immediately after the full account number or the last four digits of the account number. Card not present merchants, *i.e.*, Plaintiffs, should ask the customer for the CVV2 to verify the card's authenticity. For information security purposes, merchants are prohibited from storing CVV2 data.

[4]    AVS is a risk management tool that enables a merchant to verify the billing address of a customer presenting a credit card for payment. The merchant includes an AVS request with the transaction authorization and receives a result code indicating whether the address given by the cardholder matches the address in the Issuer's file. A partial or no-match response may indicate fraud risk.

resulting from alleged "unauthorized use of card" or form a consumer's claim that "I didn't do it."

51.     Recognizing that Defendants' efforts to combat credit card fraud were failing, Plaintiffs invested their time and millions of dollars to create and maintain antifraud organizations, databases and technological systems to assist themselves and fellow online merchants with fraud detection and prevention techniques.

52.     Plaintiffs' antifraud organizations were a joint effort by participating merchants in the Industry that utilized artificial intelligence to develop databases that would allow merchants to identify unusual patterns of names, card numbers and computer networks. Through these organizations, Plaintiffs were able to detect suspicious fraudulent activity and thereby reject transactions in real time in advance of being processed.

53.     Plaintiffs' antifraud organizations eliminated most, if not all, truly fraudulent transactions (as opposed to transactions involving "**cybershoplifting fraud**").

54.     To further bolster their fraud prevention efforts, some Plaintiffs retained outside firms, which some firms Defendants have endorsed. These firms specialize in identifying fraudulent or high risks transaction. These firms would screen Plaintiffs' transactions and when these firms would flag a transaction as being a "high risk," Plaintiffs would decline the sale.

55.     Despite the considerable expenses to Plaintiffs of adding this layer of fraud protections, Plaintiffs placed themselves on the cutting edge of fraud prevention not only for their own benefit, but also for the benefit of Defendants and their members.

## H. Formation of the Enterprise and Nature of the Conspiracy

56. Visa and MasterCard are national bank card associations whose members include banks, regional banking associations and other financial institutions. Visa and MasterCard were established by their members to develop, promote and operate national bank card networks.

57. Visa and MasterCard evolved from regional and local credit card systems formed during the 1960's.

58. Visa's predecessor, BankAmericard, was the local credit card program of the Bank of American, based in California. In 1970, the program was introduced throughout the United States under the name, National Bank Americard, Inc. ("**NBI**"). In 1977, NBI changed its name to Visa.

59. MasterCard is the successor to MasterCharge, which was created in 1967 when the Interbank Card Association of New York banks merged with the Western States Bankcard Association.

60. Under the original rules, the Visa and MasterCard Associations were distinct. Members of the Visa could not issue MasterCard credit and debit cards to their customers. In 1976, Visa's rules were amended to permit duality and the "Enterprise" was formed. Thereafter, banks became members of both Visa and MasterCard and issued both brands of credit and debit cards. Banks could also "acquire" merchant accounts for both Visa and MasterCard. Every major bank in the United States is a member of both Visa and MasterCard, and there is currently more than 95% overlap in the Associations' memberships. Furthermore, virtually every merchant that accepts Visa credit and debit cards as a form of payment also accepts MasterCard credit and debit cards. There are very few exceptions to the Enterprise among the approximately 6,000 financial institutions that issue Visa and/or MasterCard credit and debit cards, and the

approximately 1,000 financial institutions that acquire merchant accounts for Visa and/or MasterCard.

61. The creation of the Enterprise accelerated two trends that have characterized and dominated the development of the Associations. First, because their memberships are virtually identical, the Associations coordinate much, if not all, of their activity through joint programs, consciously parallel activity and tacit conspiracy. The creation of the Enterprise also facilitated a high degree of uniformity in interest rates and fees charged by the Associations' owner-members to merchants, and discount rates charged by the Associations' owner-members to merchants accepting Visa and MasterCard credit and debit cards.

62. The trend towards uniformity in pricing among dual Visa/MasterCard members have been facilitated and exacerbated because Visa bank members collectively fix the Visa interchange fees and contemporaneously, acting as MasterCard members, collectively fix the MasterCard interchange fees. These price fixed interchange fees are the bulk of the final "discount fees" charged to merchants who accept Visa and MasterCard credit and debit cards.

63. The Associations monitored fraud in the Industry and realized that considerable revenues could be derived to their members from transactional and penalty fees associated with fraudulent transactions. The Association agreed that their penalty fee strategy required Defendants to act in concert with each other in implementing uniform procedures implementing such fees associate with fraudulent transactions. This Enterprise and conspiracy still continues today.

64. The fundamental goal of the Enterprise was to preserve and expand its revenues from fraudulent transactions. To achieve its goal, Defendants' strategy was to misrepresent

and/or conceal its statutory duties as a banking institution, and aid and abet fraud and deception thereof.

65. To further and protect the Enterprise, the conspiracy and their profits, Defendants used both mail and wire to conspire to: (i) breach their statutory duties to Plaintiffs when authenticating transactions from 1994 to the date of this Complaint; (ii) breach their statutory duties to Plaintiffs when settling transactions from 1994 to the date of this Complaint; (iii) breach their statutory duties to Plaintiffs during their application process from 1994 to the date of this Complaint; (iv) improperly bill Plaintiffs from 1994 to the date of this Complaint; (v) improperly debit Chargeback Fees from Plaintiffs' merchant accounts from 1994 to the date of this Complaint; (vi) fail to fulfill their statutory duties to Plaintiffs from 1994 to the date of this Complaint; and (vii) make unauthorized withdrawals from Plaintiffs' merchant accounts from 1994 to the date of this Complaint.

66. Throughout the course of the Enterprise and conspiracy and to the present day, Defendants have engaged in these acts knowingly and intentionally and with a common purpose.

### I.     The Present and Continuing Threat

67. Defendants' conspiracy to deceive, mislead, and withhold information from Plaintiffs, including their rules and regulations and manipulation of penalty fees associated with fraudulent transactions, including continuously reclassifying and/or recoding Plaintiffs' transactions that result in higher transactional fees.

68. In their public and written statements, Defendants continue to deny that they have any responsibility for fraud in the Industry and use various misleading explanations for their role in fighting fraud.

69.     Moreover, in Chargeback situations and based on Defendants conduct, Defendants take the position that Plaintiffs are guilty until proven innocent despite overwhelming evidence that Plaintiffs present that their cardholder has actually purchased a product/service from Plaintiffs, *e.g.*, a signed contract.

70.     In addition to their repetition of the same false and misleading statements discussed above, Defendants also continue to suppress and conceal documents and information pertaining to their rules and regulations, which they allege Plaintiffs are required to comply with such suppressed and concealed documents and information.

71.     Indeed, to this day, Defendants are continuing to block disclosure of the very documents that reveal the rules and regulations that they require Plaintiffs to adhere to, which in all likelihood reveal their conspiracy to deceive Plaintiffs.

72.     Defendants, who, for example, hold over 96% of the credit card market in the Industry, pose a continuing threat to collect unjust and unenforceable fines levied against Plaintiffs and there is every reason to believe that they will continue with their fraudulent and unlawful conduct.

73.     The effects of Defendants' conspiracy will be felt for many years into the future, and Defendants continue to benefit from their past and present fraudulent statements, suppression of information and conduct. Plaintiffs remain victims of Defendants illegal activity and will be far into the foreseeable future, all while Defendants continue to earn enormous profits from fraud.

**J.      Defendants' Legal Liability During the Authentication Process**

74.     Plaintiffs have continuously notified Defendants of suspicious activity in which the cardholder's credit card were declined, or notified Defendants of fraudulent activity.

Although Defendants have the ability to track where the purchases came from, they refused to track such cardholders to prevent further fraud to other members of the Class. Defendants have the sole power to terminate the existing credit card account, refuse to pay any charges on the account, list the credit card as stolen or compromised, transfer all existing, valid charges to a new account or send the cardholder a new card bearing his new account member.

75. Plaintiffs have continuously called Defendants to authenticate (CVV2 and AVS) their transactions. However, Defendants often fail to advise Plaintiffs of the possibility of "notice of dishonor or non-payment," or of a compromised card, and cleared these transaction despite such knowledge. During the authentication process, Defendants have also failed to disclose to Plaintiffs that the certain credit cards were stolen.

76. In similar authentication situations, Defendants have known (or were on notice) that fraud was afoot and did nothing to neither stop it nor inform Plaintiffs of such fraud potential, although they have the last clear chance to do so. "It is, after all, a bank's business to make certain that it does not deal with crooks." Broadway National Bank v. Barton-Russell Corp., et al., 585 N.Y.S.2d 933, 941 (N.Y. Sup. Ct. 1992).

77. Defendants have conspired with such issuing banks to create and/or process Chargeback Fees in order to levy significant fines to Plaintiffs even where such Chargeback Fees could be avoided if Defendants fulfilled their duties as a credit issuer. There is direct and circumstantial evidence that Defendants have an incentive not to fulfill their statutory duties. If Defendants let fraud continue to occur, they will receive revenues from Chargeback Fees that will accompany each and every fraudulent transaction.

**K.     Defendants' Liability During the Settlement Process**

78.     Cardholders purchase products or services from Plaintiffs. After receiving such goods or services from Plaintiffs, some cardholders decide that they do not want such goods or services. Such cardholders contact Defendants and demand a refund. Thereafter, Defendants, through their Co-Conspirators, immediately debited Plaintiffs' merchant account for the sale and shipping price as well as debit a Chargeback Fee against Plaintiffs' merchant account. As a result of Defendants immediate action, many cardholders never return the rejected goods or services. Thus, due to Defendants breach of duty, Plaintiffs not only lose the sale and shipping price and are fined a Chargeback Fee, but they also lose such product or service. The above-mentioned factual scenario is often referred to as "**cybershoplifting**."

79.     In other settlement situations, Defendants would penalize Plaintiffs for duplicative Chargeback Fees.

80.     In other settlement situations, Defendants would debit Plaintiffs' merchant account for Chargeback Fees when Plaintiffs have already issued a credit to the consumer. In these situations, no Chargeback Fees are justified or warranted in many instances because Plaintiffs have already issued a refund to the customer by the time a Chargeback Fee is processed. Moreover, the costs of a Chargeback Fee to Plaintiffs are usually more than 50% higher than the actual Chargeback Fee.

81.     In other settlement situations, some Plaintiffs have strict "no refund" policies that were not unconscionable and were sufficient to negate any claim of good faith, but yet, Defendants issued Chargeback Fees against Plaintiffs. Essentially, every miniscule dispute that a cardholder has had against Plaintiffs to excuse itself from its obligation to pay Plaintiffs, Defendants have arbitrary and capriciously debited Plaintiffs' merchant account for the sales

price, shipping costs and issued Chargeback Fees. Moreover, many of these cardholders were within 100 miles from Plaintiffs. *See* Consumer Credit Protection Act, 15 U.S.C.S. § 1666i.

82.     Moreover, before reversing such charges in cybershoplifting scenarios, if Defendants just required that the cardholder return the rejected goods, then Plaintiffs would not also lose their products as well.

83.     Defendants claim that they are not responsible for Plaintiffs' loss of such merchandise. However, because they are a financial institution, they not only have statutory duties to their cardholders, but also to Plaintiffs, which they continue to breach as of the date of this Complaint.

84.     Defendants knowingly have obtained Plaintiffs' property with intent to, either temporary or permanently, deprive Plaintiffs of their rights to such funds and property.

85.     Moreover, Defendants have aided and abetted in the theft of Plaintiffs' property with intent to, either temporary or permanently, deprive Plaintiffs of their rights to such property.

**L.     Excessive Chargeback Fees**

86.     At the time of entering into the merchant agreement, Plaintiffs understood that Chargeback Fees were their only exposure in connection with possible Chargeback Fees. However, under Defendants rules and regulations, Plaintiffs were also exposed to additional Chargeback Fees if their ratio of Chargeback Fees from international transactions to overall international transactions exceeds a certain percentage level. In this scenario, Defendants impose a higher Chargeback Fee, approximately a $100.00 per Chargeback Fee, and if the merchant's Chargeback Fee Ratio ("**Chargeback Fee Ratio**") exceeds a certain percentage level following the initial penalties in the following months, then the per Chargeback Fee penalty increases again.

87.    After entering into a merchant agreement with Defendants, Plaintiffs were shocked to be informed by Defendants that they would be subject to new penalties under Defendants' "Overall Chargeback Fee Monitoring Program" whereby Defendants would impose a $100 fine for every Chargeback Fee when the ratio of total Chargeback Fees (international and domestic) to total transactions exceed 2 ½ %. Plaintiffs were never provided with a copy of Defendants' rules and regulations, and therefore did not have knowledge of Defendants' Overall Chargeback Fee Monitoring Program. This program issued penalties on all Chargeback Fees, including disputed Chargeback Fees, reversed Chargeback Fees, Chargeback Fees from CVV2 authenticated transactions, AVS authenticated transactions and Chargeback Fees falling within the acceptable threshold, the amount of the penalty would be devastating. Finally, many Plaintiffs' fraud protection measures have essentially eliminated most traditional fraud, and the current Chargeback Fees were resulting almost exclusively from "cybershoplifting fraud."

**M.    Calculation of Chargeback Fee Ratios**

88.    Visa calculates the Chargeback Fees Ratios by comparing the number of Chargeback Fees processed in a given month against the total number of transactions processed by the merchant in the same month, even though the Chargeback Fees may apply to (and in all likelihood would have applied to) transactions occurring in previous months. Thus, when a merchant experiences a decrease in sales, Chargeback Fees from transactions occurring in previous months inflate a merchant's Chargeback Fee Ratio.

89.    In many circumstances, when comparing the total number of Chargeback Fees to the total transactions occurring in the same month, Plaintiffs would not have been subject to any fines in a given month, even if Plaintiffs assumes, for the sake of argument, that each Chargeback Fee was in fact a legitimate Chargeback Fee. Despite this, Defendants (by itself,

themselves, or through their members) imposed erroneous Chargeback Fee fines against Plaintiffs.

90. Defendants' Chargeback Fee Ratio does not exclude disputed Chargeback Fees, reversed Chargeback Fees, Chargeback Fees on CVV2 authenticated transactions, Chargeback Fees from AVS authenticated transactions, or Chargeback Fees failing within the acceptable threshold. Had these types of Chargeback Fees been excluded from Defendants' calculations, many Plaintiffs would have never exceeded acceptable levels in a given month and thereby would have avoided the imposition of erroneous Chargeback Fees.

91. Additionally, effective January 1, 2001, Defendants lowered the international Chargeback Fee Ratio from 5% to 2-½% for merchants engaged in certain industries, such as telemarketing, adult and gambling industry. To date, Defendants have never explained their legal rational to Plaintiffs why some merchants in their Industry are considered by Defendants to be an "inbound telemarketer" or "High Risk" and thereby subject to Defendants' lower Chargeback Fee Threshold and higher rates.

**N.    Unauthorized Double Chargeback Fees**

92. As noted above, Plaintiffs' Chargeback Fee Ratio has also been negatively affected by excessive Chargeback Fees made by Defendants' issuing banks. This occurs when a customer charges a transaction with a Plaintiff to its credit card and then advises Plaintiffs that it wishes to dispute the transaction. In that event, Plaintiffs immediately issues a credit to the customer's card, sends correspondence (letter, e-mail, etc.) confirmation of the credit to the customer, and notifies Defendants' issuing bank that the charge has been reversed. Notwithstanding the issuance of the credit, Plaintiffs experiences hundreds of instances each

month of Chargeback Fees where a credit has already been issued to the customer, resulting in an inflation of the Chargeback Fee Ratio.

### O. Application Fraud

93. Defendants have issued credit on their corresponding credit and debit cards in a high volume over the past decades. Despite case law affirming a duty on credit issuers to exercise reasonable care and diligence in performing a necessary investigation of each credit card application received, including verifying the underlying information on the applicant's application, the applicant's identity, address and authority, and such investigation must occur prior to the issuance of credit. As a result of their breach of duties, Defendants have repeatedly given credit to persons or entities that have a history of conducting fraudulent transactions.

94. Defendants are in a superior position to prevent and stop credit card fraud; particularly where the cardholder listed on the application never applied for or received the credit card. Yet, Defendants claim that they have no responsibility for fraudulent transactions conduct by means of a telephone, mail or the Internet. Despite taking zero responsibility for such actions, Defendants issue higher transactional fees to Plaintiffs.

### P. MasterCard's Illegal Exercise Of Monopolistic Power

95. As outlined above and as the District Court established in USA v. Visa, Visa and MasterCard individually and jointly have been able to:

      (a)      Gain a monopoly market power in the Industry;

      (b)      Orchestrate significant barriers to their competitors that restrict entry or expansion in their market; and

(c)     Raise their fees associated with credit and debit card transactions in the Industry without losing a significant number of merchant clients because of this monopolistic power.

96.     As a result of this monopolist power and illegal abuse thereof, Visa and MasterCard have injured Plaintiffs.

       *1.*     *Monopolistic Powers Forces Plaintiffs to Bear Risks and Costs of Fraud*

97.     Despite Plaintiffs efforts in complying with Visa and MasterCard's rules and regulations, and implementation of their own anti-fraud systems, Visa and MasterCard admit that such fraud in the Industry is "a serious dilemma for merchants," which such costs for fraud in the Industry is ultimately born by Plaintiffs.

98.     Furthermore, despite the known risk of fraud in the Industry using Visa and MasterCard's credit and debit cards and the risks known to Visa and MasterCard in the systems designed, established and maintained by them, Visa and MasterCard have abused their monopolistic power and require Plaintiffs in the Industry to:  (a) bear all costs associated with Plaintiffs' anti-fraud systems; (b) bear all additional costs to hire personnel to manage and resolve fraudulent credit and debit card transactions; (c) refund the sales price and shipping costs to all cardholders in cybershoplifting scenarios; (d) refund the sales price and shipping costs to each Issuing Bank in each transaction that results in a Chargeback Fee; (e) pay a Discount Rate fee to Visa and MasterCard and their Member Banks in each transaction where there is a Chargeback Fee; (f) bear an additional per-Chargeback Fee for each transaction which has resulted in a Chargeback Fee; and (h) bear all costs for lost products or services resulting from fraud in the Industry.

99.    Despite the fact that Plaintiffs have to bear all costs mentioned above, Visa and MasterCard admit that there are no methods or required facts that a merchant needs to argue to successfully dispute a cardholder's claim that a purchase was not made.

100.    All of these costs amount to monopolistic profits to Visa and MasterCard.

101.    Moreover, Plaintiffs have not voluntarily paid these monopolistic profits to Visa and MasterCard.

102.    If there were competitive competition in the Industry for credit and debit card services, then competition would have lowered the costs to merchants for accepting credit and debit cards in the Industry, thereby forcing Visa and MasterCard to assume or at least share a portion of the costs associated with fraud occurring in the Industry.

103.    Furthermore, Visa and MasterCard understood and realized their dominant position in the credit and debit card marketplace, and intentionally or knowingly failed to provide appropriate security to their systems that store their cardholders' credit and debit cards because of the overall profits that they could make, and have made, as a result of fraud in the Industry. As a result of providing inadequate security systems to their cardholders' credit and debit cards, there have been known or unknown breaches to their security systems that have resulted in their cardholders' credit and debit cards being stolen or compromised. Not only do Visa and MasterCard gain financially by failing to provide appropriate security system to their cardholders' credit and debit cards, but they also aid and assist fraud and theft in the Industry.

104.    Because of their monopolist power, Visa and MasterCard are in a position in which they can fully prevent fraud in the Industry through the implementation of new procedures, technological innovations and changes to their Rules and Operating Procedures. Such action would equalize the burden and costs of fraud to merchants, cardholders, Issuing

Banks, Acquiring Banks and Visa and MasterCard itself. However, Visa and MasterCard tie the acceptance of their policy of zero responsibility and accountability for fraud in the Industry for card not present transactions to Plaintiffs' acceptance of Visa and MasterCard credit and debit cards.

105.    As a direct and proximate cause of Visa and MasterCard's monopolistic powers, Plaintiffs have been damaged in an amount to be proven at trial but estimated to exceed $383,000,000. Moreover, unless and until Visa and MasterCard are specifically restrained from requiring merchants to pay all fees and costs for Chargeback Fees related to transactions conducted in the Industry, Plaintiffs will continue to be damaged by this illegal use of Visa and MasterCard's monopolistic power.

   2.    *Monopolistic Profits Forces Plaintiffs to Pay Excessive Interchange Rates*

106.    It is well established in precedent, allegations mentioned above and through Visa and MasterCard's own admissions that Visa and MasterCard charge merchants in the Industry higher Interchange Rates and Discount Rates than they charge to "brick and mortar" merchants. It is well established in precedent, allegations mentioned above and through Visa and MasterCard's own admissions that merchants in the Industry bear virtually all risks and costs associated with fraud and theft in the Industry. Accordingly, Visa and MasterCard cannot justify such higher Interchange Rates and Discount Rates on the basis of their risks and costs associated with fraud and theft in the Industry.

107.    As a direct and proximate cause of Visa and MasterCard's illegal use of their monopolistic powers of charging higher Interchange Rates and Discount Rates, Plaintiffs have been damaged in an amount to be proven at trial. Moreover, Plaintiffs will continue to be damaged by this illegal use of Visa and MasterCard's monopolistic powers unless and until Visa

and MasterCard are specifically restrained from charging such excessive Interchange Rates and Discount Rates to merchants in the Industry.

   3.   *Monopolistic and Unjust Profits From Chargeback Fees and Penalties*

108.   Visa and MasterCard each have viewed the number of Chargeback Fees originating from each merchant in the Industry as an frequency indicator in the number of fraudulent transactions that such merchant processes. Visa and MasterCard each evaluate this frequency level of fraud on the basis of the ratio of Chargeback Fees received by such merchant in a given month as compared to the total number of sales transactions made by that merchant in the same month, *i.e.*, the Chargeback Fee Ratio.

109.   As mentioned above, all merchants in the Industry experience the same risks of fraud because of their inability to dispute a cardholder's claim that a purchase was not made. However, Visa and MasterCard have viewed and categorized certain merchants in the Industry as "High Risk". Over the past several years, Visa and MasterCard have enacted and enforced new procedures and programs to their Rules and Regulations that require such "High Risk" merchants to reduce their level of fraud (*i.e.*, Chargeback) or face higher Chargeback Fees and fines, and/or cancellation of their merchant account with Visa and MasterCard respectively. Such new procedures and programs include "Computer Network and Inbound Telemarketing Merchants Excessive Chargeback Fee Program" and the MATCH file.

110.   In particular, Visa and MasterCard require merchants in certain industries within the Industry, *e.g.*, the adult entertainment industry, to pay additional fees than other similarly situated merchants that are not associated with such industries.

111.   Visa and MasterCard each have a set Chargeback Fee Ratio target thresholds ("**Chargeback Fee Thresholds**") that they want such "High Risk" merchants to stay under, and

have established departments within their respective organizations to track and report to their member Acquiring Banks about any such merchants whose Chargeback Fee Ratios in any given month exceed those proscribed thresholds.

112. If Plaintiffs in the Industry breach their respective Chargeback Fee Ratio, Visa and MasterCard impose substantial penalty fees directly or indirectly to such merchants.

113. As a result of these Visa and MasterCard's new procedures and programs and the potential risk of bearing the costs to pay such penalty fees and/or loss of their respective merchant account with Visa and/or MasterCard, many Plaintiffs in the Industry never dispute a fraudulent transaction, and fraud and theft continues to prosper in the Industry.

114. Unless and until Visa and MasterCard are specifically restrained from assessing and collecting chargeback-related fines and penalties against Plaintiffs (through their Acquiring Bank), Plaintiffs will continue to be damaged by this illegal use of Visa and MasterCard's monopolistic power despite being in full compliance with Visa and MasterCard's Chargeback Fee Threshold.

    4.    *Monopolistic and Unjust Profits From Credit Penalty Fees*

115. Under Visa and MasterCard's rules and regulations, merchants are instructed to reconcile any complaints or requests for refunds from cardholders and, where appropriate, to issue a credit at the cardholder's request. Moreover, as described above, there are almost no ways for merchants to dispute a claim in the cybershoplifting scenario. However, under Visa and MasterCard's monopolist powers, Plaintiffs who have a Chargeback Fee Ratio are damned if they issue a refund to their cardholders, and damned if they don't issue a refund to their cardholders. If such Plaintiffs issue a refund/credit to cardholders for a claim of unauthorized use of the credit or debit card or dissatisfaction with their product, then more likely than not,

Visa and MasterCard will issue a credit penalty fee to Plaintiffs for issuing refund/credit to cardholders in this situation. On the other hand, if such Plaintiffs refuse to issue a refund/credit to cardholders for a claim of unauthorized use of the credit or debit card or dissatisfaction with their product, then more likely than not, Visa and MasterCard will issue a Chargeback Fee to such Plaintiffs. Therefore, such penalty fees issued by Visa and MasterCard in this situation are illegal monopolistic profits.

116. Plaintiffs have not voluntarily consented to pay such illegal monopolistic profits to Visa and MasterCard. Certainly if Visa and MasterCard have a competitive market in the Industry, they would not be able to issue such supra-competitive fees.

117. Moreover, such abuse of their monopolistic powers by Visa and MasterCard discourage Plaintiffs to lower their Chargeback Ratios.

118. As a direct and proximate result of Visa and MasterCard's use of their monopolistic powers to issue credit penalty fees to Plaintiffs for issuing a refund/credit to cardholders in situations in which such refund/credit is in compliance with Visa and MasterCard's rules and regulations, Plaintiffs have been damaged in an amount to be proven at trial. Moreover, unless and until Visa and MasterCard are specifically restrained from penalizing Plaintiffs for issuing such refunds/credits, Plaintiffs will continue to be damaged by this illegal use of Visa and MasterCard's monopolistic powers.

### 5. *Boycott Anti-Competitive Behavior*

119. Upon information and belief, Plaintiffs believe that Visa and MasterCard reserve the right and power to compel their member Acquiring Banks to assess and collect such fines and penalties from "High Risk" and "Excessive Chargeback Fee" Plaintiffs until such Plaintiffs ceases accepting Visa and MasterCard cards or such Plaintiffs' Acquiring Bank terminates their

relationship with Plaintiffs. Such conduct amounts to an attempt by Visa and MasterCard to restrain trade by effectively imposing a boycott on certain Plaintiffs through their Acquiring Bank.

6. _Unjust Withholding of Funds_

120. Visa and MasterCard through their Co-Conspirators require certain merchants in the Industry to have a cash/credit retainer for potential Chargeback Fee liability. After Plaintiffs meet certain predetermined conditions, Defendants are required to release all or a certain portion of cash retained in this retainer. However, Defendants, through their Co-Conspirators, routinely fail to release such cash/credit when Plaintiffs meet the predetermined conditions.

121. As a direct and proximate result of Visa and MasterCard's use of their monopolistic powers to retain such cash/credit when Plaintiffs meet the predetermined conditions, Plaintiffs have been damaged in an amount to be proven at trial. Moreover, unless and until Visa and MasterCard are specifically restrained from unjustly retaining such cash, Plaintiffs will continue to be damaged by this illegal use of Visa and MasterCard's monopolistic powers.

7. _Consumer Harm_

122. The above-described policies and practices of Visa and MasterCard have a direct and substantial effect on Plaintiffs in millions of dollars in costs, transactional and penalty fees, the overall marketplace in the Industry and general-purpose payment cards.

123. Such policies and procedures allow Visa and MasterCard to reap monopolistic profits that eventually will come out of the wallets of individual consumers in higher prices for everything purchased over the Internet.

## VI. Court Costs: Conditions Precedent

124.    Plaintiffs have retained the undersigned law firm to represent them in this action and are obligated to pay them for court costs associated with this action.

125.    All conditions precedent to the institution of this action has been waived, performed or have occurred.

## FIRST CLAIM FOR RELIEF
## PLAINTIFFS AGAINST VISA AND ITS CO-CONSPIRATORS
## RICO -- 18 U.S.C. § 1962(c)

126.    Plaintiffs realleges and incorporate by reference in this Count the allegations contained above as if fully set forth herein.

127.    Plaintiffs are "persons" within the meaning of 18 U.S.C. § 1964(c).

128.    At all times relevant hereto, Plaintiffs and Visa and its Co-Conspirators were and are "persons" within the meaning of 18 U.S.C. § 1961(3).

129.    The following persons, and others presently unknown, have been members of and constitute an "Enterprise" within the meaning of RICO, which Plaintiffs collectively refer to as the "**Enterprise**": (1) Visa; and (2) its corresponding member banks.

130.    The Enterprise is an ongoing enterprise, which engages in, and whose activities affect, interstate and international commerce. From 1976 and continuing up to and including the date of the filing of this Complaint, there existed an "Enterprise" within the meaning of 18 U.S.C. sections 1961(4) and 1962(c) in the state of North Carolina and elsewhere, described below. Visa and its Co-Conspirators, being persons employed by or associated with the Enterprise described below, did unlawfully, knowingly, and intentionally conduct and participate, directly and indirectly, in the conduct, management, and operation of the affairs of the aforementioned Enterprise, which was engaged in, and the activities of which affected,

interstate and foreign commerce, through a pattern of racketeering activity consisting of numerous acts of racketeering in the state of North Carolina and elsewhere, indictable under 18 U. S. C. § 1341 (relating to mail fraud), §1343 (relating to wire fraud), and § 1346 (relating to scheme or artifice to defraud), including, but not limited to, the acts of racketeering alleged in this Complaint in violation of 18 U. S. C. §§ 1962 (c) and (d).

131.    While Visa and its Co-Conspirators participated in the Enterprise and are a part of it, Visa and its Co-Conspirators also have an existence separate and distinct from the Enterprise.

132.    Visa and its Co-Conspirators conducted or participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity.

133.    Visa and its Co-Conspirators participation in the Enterprise are necessary for the successful operation of Visa and its Co-Conspirators' scheme.

134.    The Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Visa and its Co-Conspirators engage.  The Enterprise operated and operates with two related structures, one of which is headed by Visa, and the other of which is headed by Visa's Co-Conspirators, and together they operate the Enterprise and conduct in the pattern of racketeering activity.

A.    *Predicate Acts*

135.    The numerous predicate acts of mail and wire fraud described herein and as set forth above are part of the fraudulent schemes by Visa and its Co-Conspirators designed to maximize their revenues through breach of their contractual and statutory duties, as well as enforcing unlawful penalty fees against Plaintiffs through the means of wire and mail.

136. Section 1961(1) of RICO provides that "racketeering activity" is any act indictable under any of the provisions of Title 18, United States Code § 1341 (relating to mail fraud), §1343 (relating to wire fraud), and § 1346 (relating to scheme or artifice to defraud).

137. In carrying out the overt acts and fraudulent schemes described above, Visa and its Co-Conspirators engaged in, among other things, conduct that violate federal laws, including 18 U.S.C. §§ 1341, 1343, and 1346, 18 U.S.C. § 1952(a), and 18 U.S.C. § 1961 et seq.

138. Examples of the predicate acts committed by Visa and its Co-Conspirators pursuant to their scheme to breach their contractual and statutory duties and debit unenforceable penalty fees from Plaintiffs' merchant accounts include those acts set forth above. Upon information and belief, there have been numerous other predicate acts by Visa and its Co-Conspirators that are presently unknown to Plaintiffs.

B. *Mail And Wire Fraud*

139. For the purpose of executing and/or attempting to execute their scheme to defraud Plaintiffs by means of false pretenses, representations or promises and obtaining Plaintiffs' property through such unlawful acts, Visa and its Co-Conspirators, in violation of 18 U.S.C. § 1341, placed in post offices and/or in authorized repositories for mail matter and things to be sent or delivered by mail, and received matter and things therefrom, including but not limited to money, agreements, monthly statements, correspondence, faxes, and other materials.

140. For the purpose of executing and/or attempting to execute their scheme to defraud Plaintiffs by means of false pretenses, representations or promises and obtaining Plaintiffs' property through such unlawful acts, Visa and its Co-Conspirators, in violation of 18 U.S.C. § 1343, transmitted and received by wire matter and things therefrom, including but not limited to money, agreements, monthly statements, correspondence, faxes, and other materials.

141. In those matters and things sent or delivered by mail, by wire, and through other interstate and international electronic media, Visa and its Co-Conspirators falsely and fraudulently misrepresented and/or fraudulently concealed material facts from Plaintiffs and obtained Plaintiffs' property with intent to either temporary or permanently deprive Plaintiffs to such property, in violation of 18 U.S.C. §§ 1341 and 1343, including but not limited to those acts set forth above.

142. As a result, Plaintiffs have been injured in their business or property by Visa and its Co-Conspirators overt acts and racketeering activities.

C. *Pattern of Racketeering Activity*

143. As set forth herein, Visa and its Co-Conspirators have engaged in a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5), by committing and/or conspiring to commit at least two such acts of racketeering activity, as described herein, within the past ten years. Visa and its Co-Conspirators have committed multiple acts of racketeering activity within such period. Each such act of racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results impacting upon similar victims, including Plaintiffs.

144. The multiple acts of racketeering activity committed and/or conspired to commit by Visa and its Co-Conspirators, as described above, were related to each other and amount to and pose a threat of continued racketeering activity, and, therefore, constitute a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5).

145. Section 1962(c) of RICO provides that "[i]t shall be unlawful for any person employed by or associated with any Enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of

such Enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

146.    Through the patterns of racketeering activities outlined above, Visa and its Co-Conspirators have conducted and participated in the affairs of the Enterprise.

147.    As a direct and proximate result of Visa and its Co-Conspirators' illegal conduct as set forth above in violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business or property, including, but not limited, by:

(a)    the theft of Plaintiffs' funds debited/wired from their merchant accounts and shown on their mailed monthly statements by Visa and its Co-Conspirators;

(b)    the lost profits Plaintiffs would have achieved but for Visa and its Co-Conspirators' unlawful conduct;

(c)    lost opportunity to use funds held by Visa and its Co-Conspirators during a disputed transaction;

(d)    the interest Plaintiffs lost when Visa and its Co-Conspirators had possession of Plaintiffs funds either by unlawful means alleged herein or during the duration of a disputed transaction;

(e)    the lost billable time, often over an hour of Plaintiffs personnel time, to research which customer and the product/service purchased by such customer in a Chargeback situation because Visa and its Co-Conspirators only disclose to Plaintiffs the date of the transaction, amount of the charge and the credit number when notifying Plaintiffs that they are receiving a Chargeback Fee;

(f)    the theft of Plaintiffs funds by continuously providing improper reclassification or improper coding of their transaction which ultimately result in Plaintiffs paying higher transactional fees to Visa and its Co-Conspirators;

(g)    the damage to Plaintiffs' businesses that has occurred as a result of the pending settlements of transaction with Visa and its Co-Conspirators;

(h)    the harm to Plaintiffs' goodwill that has occurred as a result of Visa and its Co-Conspirators unlawful conduct; and

(i)    all harm and damage alleged herein.

148.    With respect to their violations of 18 U.S.C. § 1962(c), Visa and its Co-Conspirators have acted at all times with malice toward Plaintiffs, and with the specific intent to commit the predicate acts alleged herein and to participate in the Enterprise.

149.    As a result of Visa and its Co-Conspirators' violations of 18 U.S.C. § 1962(c) as set forth in all previous paragraphs above, Plaintiffs have been injured in their business and property in an amount not presently known with precision, but which is, at a minimum, hundreds of millions of dollars, prior to trebling.

150.    Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted.  Plaintiffs have no adequate remedy at law.

### SECOND CLAIM FOR RELIEF
### PLAINTIFFS AGAINST MASTERCARD AND ITS CO-CONSPIRATORS
### RICO -- 18 U.S.C. § 1962(c)

151.    Plaintiffs realleges and incorporate by reference in this Count the allegations contained above as if fully set forth herein.

152.    At all times relevant hereto, MasterCard and its Co-Conspirators were and are "persons" within the meaning of 18 U.S.C. § 1961(3).

153. The following persons, and others presently unknown, have been members of and constitute an "Enterprise" within the meaning of RICO, which Plaintiffs collectively refer to as the "Enterprise": (1) MasterCard; and (2) its corresponding member banks.

154. The Enterprise is an ongoing enterprise, which engages in, and whose activities affect, interstate and international commerce. From 1976 and continuing up to and including the date of the filing of this Complaint, there existed an "Enterprise" within the meaning of 18 U.S.C. sections 1961(4) and 1962(c) in the state of North Carolina and elsewhere, described below. MasterCard and its Co-Conspirators, being persons employed by or associated with the Enterprise described below, did unlawfully, knowingly, and intentionally conduct and participate. directly and indirectly, in the conduct, management, and operation of the affairs of the aforementioned Enterprise, which was engaged in, and the activities of which affected, interstate and foreign commerce, through a pattern of racketeering activity consisting of numerous acts of racketeering in the state of North Carolina and elsewhere, indictable under 18 U. S. C. § 1341 (relating to mail fraud), §1343 (relating to wire fraud), and § 1346 (relating to scheme or artifice to defraud)., including, but not limited to, the acts of racketeering alleged in this Complaint in violation of 18 U. S. C. §§ 1962 (c) and (d).

155. While MasterCard and its Co-Conspirators participated in the enterprise and are a part of it, MasterCard and its Co-Conspirators also have an existence separate and distinct from the enterprise.

156. MasterCard and its Co-Conspirators conducted or participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity.

157. MasterCard and its Co-Conspirators participation in the Enterprise are necessary for the successful operation of MasterCard and its Co-Conspirators' scheme.

158.     The enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which MasterCard and its Co-Conspirators engage. The Enterprise operated and operates with two related structures, one of which is headed by MasterCard, and the other of which is headed by MasterCard's Co-Conspirators, and together they operate the Enterprise and conduct in the pattern of racketeering activity.

A.     *Predicate Acts*

159.     The numerous predicate acts of mail and wire fraud described herein and as set forth above are part of the fraudulent schemes by MasterCard and its Co-Conspirators designed to maximize their revenues through breach of their contractual and statutory duties, as well as enforcing unlawful penalty fees against Plaintiffs through the means of wire and mail.

160.     In carrying out the overt acts and fraudulent schemes described above, MasterCard and its Co-Conspirators engaged in, among other things, conduct that violate federal laws, including 18 U.S.C. §§ 1341, 1343, and 1346, 18 U.S.C. § 1952(a), and 18 U.S.C. § 1961 et seq.

161.     Examples of the predicate acts committed by MasterCard and its Co-Conspirators pursuant to their scheme to breach their contractual and statutory duties and debit unenforceable penalty fees from Plaintiffs' merchant accounts include those acts set forth above. Upon information and belief, there have been numerous other predicate acts by MasterCard and its Co-Conspirators that are presently unknown to Plaintiffs.

B.     *Mail And Wire Fraud*

162.     For the purpose of executing and/or attempting to execute their scheme to defraud Plaintiffs by means of false pretenses, representations or promises and obtaining Plaintiffs' property through such unlawful acts, MasterCard and its Co-Conspirators, in violation of 18

U.S.C. § 1341, placed in post offices and/or in authorized repositories for mail matter and things to be sent or delivered by mail, and received matter and things therefrom, including but not limited to money, agreements, monthly statements, correspondence, faxes, and other materials.

163. For the purpose of executing and/or attempting to execute their scheme to defraud Plaintiffs by means of false pretenses, representations or promises and obtaining Plaintiffs' property through such unlawful acts, MasterCard and its Co-Conspirators, in violation of 18 U.S.C. § 1343, transmitted and received by wire matter and things therefrom, including but not limited to money, agreements, monthly statements, correspondence, faxes, and other materials.

164. In those matters and things sent or delivered by mail, by wire, and through other interstate and international electronic media, MasterCard and its Co-Conspirators falsely and fraudulently misrepresented and/or fraudulently concealed material facts from Plaintiffs and obtained Plaintiffs' property with intent to either temporary or permanently deprive Plaintiffs to such property, in violation of 18 U.S.C. §§ 1341 and 1343, including but not limited to those acts set forth above.

165. As a result, Plaintiffs have been injured in their business or property by MasterCard and its Co-Conspirators overt acts and racketeering activities.

C.   *Pattern of Racketeering Activity*

166. As set forth herein, MasterCard and its Co-Conspirators have engaged in a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5), by committing and/or conspiring to commit at least two such acts of racketeering activity, as described herein, within the past ten years. MasterCard and its Co-Conspirators have committed multiple acts of racketeering activity within such period. Each such act of racketeering activity was related, had

similar purposes, involved the same or similar participants and methods of commission, and had similar results impacting upon similar victims, including Plaintiffs.

167.    The multiple acts of racketeering activity committed and/or conspired to commit by MasterCard and its Co-Conspirators, as described above, were related to each other and amount to and pose a threat of continued racketeering activity, and, therefore, constitute a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5).

168.    Through the patterns of racketeering activities outlined above, MasterCard and its Co-Conspirators have conducted and participated in the affairs of the Enterprise.

169.    As a direct and proximate result of MasterCard and its Co-Conspirators' illegal conduct as set forth above in violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business or property, including, but not limited, by:

(a)    the theft of Plaintiffs' funds debited/wired from their merchant accounts and shown on their mailed monthly statements by MasterCard and its Co-Conspirators;

(b)    the lost profits Plaintiffs would have achieved but for MasterCard and its Co-Conspirators' unlawful conduct;

(c)    lost opportunity to use funds held by MasterCard and its Co-Conspirators during a disputed transaction;

(d)    the interest Plaintiffs lost when MasterCard and its Co-Conspirators had possession of Plaintiffs funds either by unlawful means alleged herein or during the duration of a disputed transaction;

(e)    the lost billable time, often over an hour of Plaintiffs personnel time, to research which customer and the product/service purchased by such customer in a Chargeback situation because MasterCard and its Co-Conspirators only disclose to Plaintiffs the date of the

transaction, amount of the charge and the credit number when notifying Plaintiffs that they are receiving a Chargeback Fee;

(f)     the theft of Plaintiffs funds by continuously providing improper reclassification or improper coding of their transaction which ultimately result in Plaintiffs paying higher transactional fees to MasterCard and its Co-Conspirators;

(g)     the damage to Plaintiffs' businesses that has occurred as a result of the pending settlements of transaction with MasterCard and its Co-Conspirators;

(h)     the harm to Plaintiffs' goodwill that has occurred as a result MasterCard and its Co-Conspirators' unlawful conduct; and

(i)     all harm and damage alleged herein.

170.    With respect to their violations of 18 U.S.C. § 1962(c), MasterCard and its Co-Conspirators have acted at all times with malice toward Plaintiffs, and with the specific intent to commit the predicate acts alleged herein and to participate in the Enterprise.

171.    As a result of MasterCard and its Co-Conspirators' violations of 18 U.S.C. § 1962(c) as set forth in all previous paragraphs above, Plaintiffs have been injured in their business and property in an amount not presently known with precision, but which is, at a minimum, hundreds of millions of dollars, prior to trebling.

172.    Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted. Plaintiffs have no adequate remedy at law.

### THIRD CLAIM FOR RELIEF
### PLAINTIFFS AGAINST VISA AND MASTERCARD
### RICO -- 18 U.S.C. § 1962(c)

173.    Plaintiffs realleges and incorporate by reference in this Count the allegations contained above as if fully set forth herein.

174. The following persons, and others presently unknown, have been members of and constitute an "enterprise" within the meaning of RICO, which Plaintiffs collectively refer to as the "Enterprise": (1) Visa; (2) MasterCard; and (3) their corresponding member banks.

175. The Enterprise is an ongoing enterprise, which engages in, and whose activities affect, interstate and international commerce. From 1976 and continuing up to and including the date of the filing of this Complaint, there existed an "Enterprise" within the meaning of 18 U.S.C. sections 1961(4) and 1962(c) in the state of North Carolina and elsewhere, described below. Visa and MasterCard, and their Co-Conspirators, being persons employed by or associated with the Enterprise described below, did unlawfully, knowingly, and intentionally conduct and participate, directly and indirectly, in the conduct, management, and operation of the affairs of the aforementioned Enterprise, which was engaged in, and the activities of which affected, interstate and foreign commerce, through a pattern of racketeering activity consisting of numerous acts of racketeering in the state of North Carolina and elsewhere, indictable under 18 U. S. C. § 1341 (relating to mail fraud), §1343 (relating to wire fraud), and § 1346 (relating to scheme or artifice to defraud)., including, but not limited to, the acts of racketeering alleged in this Complaint in violation of 18 U. S. C. §§ 1962 (c) and (d).

176. While Visa and MasterCard, and their Co-Conspirators, participate in the enterprise and are a part of it, Visa and MasterCard, and their Co-Conspirators, also have an existence separate and distinct from the enterprise.

177. Visa and MasterCard, and their Co-Conspirators, conduct or participate in the conduct of the Enterprise's affairs through a pattern of racketeering activity.

178.  Visa and MasterCard, and their Co-Conspirators' participation in the Enterprise are necessary for the successful operation of Visa and MasterCard, and their Co-Conspirators' scheme.

179.  The enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Visa and MasterCard, and their Co-Conspirators, engage.  The Enterprise operated and operates with two related structures, one of which is headed by Visa, and the other of which is headed by MasterCard, and together they operate the Enterprise and conduct in the pattern of racketeering activity.

A.  *Predicate Acts*

180.  The numerous predicate acts of mail and wire fraud described herein and as set forth above are part of the fraudulent schemes by Visa and MasterCard, and their Co-Conspirators, designed to maximize their revenues through breach of their contractual and statutory duties, as well as enforcing unlawful penalty fees against Plaintiffs through the means of wire and mail.

181.  In carrying out the overt acts and fraudulent schemes described above, Visa and MasterCard, and their Co-Conspirators, engaged in, among other things, conduct that violate federal laws, including 18 U.S.C. §§ 1341, 1343, and 1346, 18 U.S.C. § 1952(a), and 18 U.S.C. § 1961 et seq.

182.  Examples of the predicate acts committed by Visa and MasterCard, and their Co-Conspirators, pursuant to their scheme to breach their contractual and statutory duties and debit unenforceable penalty fees from Plaintiffs' merchant accounts include those acts set forth above. Upon information and belief, there have been numerous other predicate acts by Visa and MasterCard, and their Co-Conspirators that are presently unknown to Plaintiffs.

*B.*     *Mail And Wire Fraud*

183.    For the purpose of executing and/or attempting to execute their scheme to defraud Plaintiffs by means of false pretenses, representations or promises and obtaining Plaintiffs' property through such unlawful acts, Visa and MasterCard, and their Co-Conspirators, in violation of 18 U.S.C. § 1341, placed in post offices and/or in authorized repositories for mail matter and things to be sent or delivered by mail, and received matter and things therefrom, including but not limited to money, agreements, monthly statements, correspondence, faxes, and other materials.

184.    For the purpose of executing and/or attempting to execute their scheme to defraud Plaintiffs by means of false pretenses, representations or promises and obtaining Plaintiffs' property through such unlawful acts, Visa and MasterCard, and their Co-Conspirators, in violation of 18 U.S.C. § 1343, transmitted and received by wire matter and things therefrom, including but not limited to money, agreements, monthly statements, correspondence, faxes, and other materials.

185.    In those matters and things sent or delivered by mail, by wire, and through other interstate and international electronic media, Visa and MasterCard, and their Co-Conspirators, falsely and fraudulently misrepresented and/or fraudulently concealed material facts from Plaintiffs and obtained Plaintiffs' property with intent to either temporary or permanently deprive Plaintiffs to such property, in violation of 18 U.S.C. §§ 1341 and 1343, including but not limited to those acts set forth above.

186.    As a result, Plaintiffs have been injured in their business or property by the Visa and MasterCard, and their Co-Conspirators' overt acts and racketeering activities.

C.    *Pattern of Racketeering Activity*

187.    As set forth herein, the Visa and MasterCard, and their Co-Conspirators, have engaged in a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5), by committing and/or conspiring to commit at least two such acts of racketeering activity, as described herein, within the past ten years.  Visa and MasterCard, and their Co-Conspirators, have committed multiple acts of racketeering activity within such period.  Each such act of racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results impacting upon similar victims, including Plaintiffs.

188.    The multiple acts of racketeering activity committed and/or conspired to commit by Visa and MasterCard, and their Co-Conspirators, as described above, were related to each other and amount to and pose a threat of continued racketeering activity, and, therefore, constitute a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5).

189.    Through the patterns of racketeering activities outlined above, Visa and MasterCard, and their Co-Conspirators, have conducted and participated in the affairs of the Enterprise.

190.    As a direct and proximate result of Visa and MasterCard, and their Co-Conspirators' illegal conduct as set forth above in violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business or property, including, but not limited, by:

(a)    the theft of Plaintiffs' funds debited from their merchant accounts and shown on their mailed monthly statements by Visa and MasterCard, and their Co-Conspirators;

(b)    the lost profits Plaintiffs would have achieved but for Visa and MasterCard, and their Co-Conspirators' unlawful conduct;

(c)     lost opportunity to use funds held by Visa and MasterCard, and their Co-Conspirators, during a disputed transaction;

(d)     the interest Plaintiffs lost when Visa and MasterCard, and their Co-Conspirators had possession of Plaintiffs funds either by unlawful means alleged herein or during the duration of a disputed transaction;

(e)     the lost billable time, often over an hour of Plaintiffs personnel time, to research which customer and the product/service purchased by such customer in a Chargeback situation because Visa and MasterCard, and their Co-Conspirators only disclose to Plaintiffs the date of the transaction, amount of the charge and the credit number when notifying Plaintiffs that they are receiving a Chargeback Fee;

(f)     the theft of Plaintiffs funds by continuously providing improper reclassification or improper coding of their transaction which ultimately result in Plaintiffs paying higher transactional fees to Visa and MasterCard, and their Co-Conspirators;

(g)     the damage to Plaintiffs' businesses that has occurred as a result of the pending settlements of transaction with Visa and MasterCard, and their Co-Conspirators;

(h)     the harm to Plaintiffs' goodwill that has occurred as a result of MasterCard and its Co-Conspirators' unlawful conduct; and

(i)     all harm and damage alleged herein.

191.     With respect to their violations of 18 U.S.C. § 1962(c), Visa and MasterCard, and their Co-Conspirators, have acted at all times with malice toward Plaintiffs, and with the specific intent to commit the predicate acts alleged herein and to participate in the Enterprise.

192.     As a result of Visa and MasterCard, and their Co-Conspirators' violations of 18 U.S.C. § 1962(c) as set forth in all previous paragraphs above, Plaintiffs have been injured in

their business and property in an amount not presently known with precision, but which is, at a minimum, hundreds of millions of dollars, prior to trebling.

193.    Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted. Plaintiffs have no adequate remedy at law.

**FOURTH CLAIM FOR RELIEF**
**PLAINTIFFS AGAINST VISA**
**RICO -- 18 U.S.C. § 1962(D)**

194.    Plaintiffs incorporate and realleges the previous paragraphs as if fully set out herein.

195.    This claim seeks relief for Visa and its Co-Conspirators' activities described herein for violations of 18 U.S.C. § 1962(d), for conspiring to violate 18 U.S.C. § 1962(c).

196.    Section 1962(d) of RICO provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

197.    Absent Visa and its Co-Conspirators' conspiracy and joint efforts, Visa and its Co-Conspirators' fraudulent enterprise would not be successful.

198.    Visa and its Co-Conspirators have violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to breach their contractual and statutory duties to Plaintiffs and debit unenforceable and illegal fees from Plaintiffs' merchant accounts, and to conduct and/or participate in, directly or indirectly, the conduct of the affairs of the § 1962(c) enterprise as described above through a pattern of racketeering activity.

199.    Visa and its Co-Conspirators and their agents have been joined in their conspiracies to violate 18 U.S.C. § 1962(c) by various third parties not named as Visa and its Co-Conspirators herein.

200. Visa and its Co-Conspirators agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), and agreed to commit overt acts and predicate acts, as alleged in this Complaint, to effectuate that conspiracy. Visa and its Co-Conspirators were aware that their acts were part of an overall pattern of racketeering activity.

201. As a direct and proximate result of Visa and its Co-Conspirators' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c) as set forth in all previous paragraphs above, Plaintiffs have been injured in their business and property in an amount not presently known with precision, but which is, at a minimum, hundreds of millions of dollars, prior to trebling.

202. Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted. Plaintiffs have no adequate remedy at law.

**FIFTH CLAIM FOR RELIEF**
**PLAINTIFFS AGAINST MASTERCARD**
**RICO -- 18 U.S.C. § 1962(D)**

203. Plaintiffs incorporate and realleges the previous paragraphs as if fully set out herein.

204. This claim seeks relief for MasterCard and its Co-Conspirators' activities described herein for violations of 18 U.S.C. § 1962(d), for conspiring to violate 18 U.S.C. § 1962(c).

205. Absent MasterCard and its Co-Conspirators' conspiracy and joint efforts, MasterCard and its Co-Conspirators' fraudulent enterprise would not be successful.

206. MasterCard and its Co-Conspirators have violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to breach their contractual and statutory duties to Plaintiffs and debit unenforceable and illegal fees from

Plaintiffs' merchant accounts, and to conduct and/or participate in, directly or indirectly, the conduct of the affairs of the § 1962(c) enterprise as described above through a pattern of racketeering activity.

207. MasterCard and its Co-Conspirators and their agents have been joined in their conspiracies to violate 18 U.S.C. § 1962(c) by various third parties not named as MasterCard and its Co-Conspirators herein.

208. MasterCard and its Co-Conspirators agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), and agreed to commit overt acts and predicate acts, as alleged in this Complaint, to effectuate that conspiracy. MasterCard and its Co-Conspirators were aware that their acts were part of an overall pattern of racketeering activity.

209. As a direct and proximate result of MasterCard and its Co-Conspirators' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c) as set forth in all previous paragraphs above, Plaintiffs have been injured in their business and property in an amount not presently known with precision, but which is, at a minimum, hundreds of millions of dollars, prior to trebling.

210. Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted. Plaintiffs have no adequate remedy at law.

## SIXTH CLAIM FOR RELIEF
## PLAINTIFFS AGAINST VISA AND MASTERCARD
## RICO -- 18 U.S.C. § 1962(D)

211. Plaintiffs incorporate and reallege the previous paragraphs as if fully set out herein.

212. This claim seeks relief for Visa and MasterCard, and their Co-Conspirators' activities described herein for violations of 18 U.S.C. § 1962(d), for conspiring to violate 18 U.S.C. § 1962(c).

213. Absent Visa and MasterCard, and their Co-Conspirators' conspiracy and joint efforts, Visa and MasterCard, and their Co-Conspirators' fraudulent enterprise would not be successful.

214. Visa and MasterCard, and their Co-Conspirators have violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to breach their contractual and statutory duties to Plaintiffs and debit unenforceable and illegal fees from Plaintiffs' merchant accounts, and to conduct and/or participate in, directly or indirectly, the conduct of the affairs of the § 1962(c) enterprise as described above through a pattern of racketeering activity.

215. Visa and MasterCard, and their Co-Conspirators and their agents have been joined in their conspiracies to violate 18 U.S.C. § 1962(c) by various third parties not named as Visa and MasterCard, and their Co-Conspirators herein.

216. Visa and MasterCard, and their Co-Conspirators agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), and agreed to commit overt acts and predicate acts, as alleged in this Complaint, to effectuate that conspiracy. Visa and MasterCard, and their Co-Conspirators were aware that their acts were part of an overall pattern of racketeering activity.

217. As a direct and proximate result of Visa and MasterCard, and their Co-Conspirators' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c) as set forth in all previous paragraphs above, Plaintiffs

have been injured in their business and property in an amount not presently known with precision, but which is, at a minimum, hundreds of millions of dollars, prior to trebling.

218.    Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted.  Plaintiffs have no adequate remedy at law.

## SEVENTH CLAIM FOR RELIEF
## PLAINTIFFS AGAINST VISA AND MASTERCARD
## VIOLATION OF STATE RICO ACT

219.    Plaintiffs incorporate and reallege the previous paragraphs as if fully set our herein.

220.    Each of the acts complained of in the first six claims for relief also violate similar racketeer influenced and corrupt organizations acts under state law.  Under such state law, Plaintiffs are entitled to recover equitable and/or compensatory damages, and under certain state laws, treble damages, Plaintiffs' reasonable attorneys' fees and costs, for their injuries caused by the wrongful conduct of Visa and MasterCard and their Co-Conspirators, individually, and jointly.

221.    As a direct and proximate cause of Visa and MasterCard and their Co-Conspirators' racketeering activity as set forth in all previous paragraphs above, Plaintiffs have been injured in their business and property in an amount not presently known with precision, but which is, at a minimum, hundreds of millions of dollars, prior to trebling.

222.    Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted.  Plaintiffs have no adequate remedy at law.

## EIGHT CLAIM FOR RELIEF
## PLAINTIFFS AGAINST VISA
## VIOLATION OF SHERMAN ACT § 1

223.    Plaintiffs incorporate and reallege the previous paragraphs as if fully set out herein.

224.    Beginning in or about 1979, the exact date unknown by Plaintiffs, and continuing thereafter until filing of this Complaint, Visa and its Co-Conspirators have continually engaged in an unlawful contract, combination, conspiracy and agreement in unreasonable restraint of interstate trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, including forced and coerced contracts and agreements with Plaintiffs requiring them to pay supra-competitive transactional and penalty fees in the Card Not Present Payment Card Market ("**CNP Payment Card Market**").

225.    The contract, combination and conspiracy have consisted of a continuing agreement, understanding and concert of action among Visa and its Co-Conspirators, and forced contracts and agreements with Plaintiffs, the substantial purpose of which has been to profit from fraud conducted in the Industry while breaching their contractual and statutory duties to Plaintiffs, who agree, albeit under coercion and/or unwittingly, to pay such supra-competitive transactional and penalty fees.

226.    At all times, Visa and its Co-Conspirators have a monopoly power and/or market power and/or economic power in the relevant CNP Payment Card Market, sufficient to force Plaintiffs to accept and pay such supra-competitive transactional and penalty fees.

227.    The continued employment of the supra-competitive transactional and penalty fees in the CNP Payment Card Market achieves no legitimate efficiency benefit to

counterbalance its demonstrated anticompetitive effect of foreclosing merit competition in the CNP Payment Card Market.

228. Plaintiffs were forced by Visa and its Co-Conspirators to accept and pay such supra competitive transactional and penalty fees.

229. The ability of Plaintiffs to accept and pay superior and less costly transactional and penalty fees were effectively and substantially reduced, limited and foreclosed.

230. The contract, combination, conspiracy and agreement have been effectuated by the means and overt acts set forth above, among others.

231. Visa and its Co-Conspirators and others acting in concert with them intended by their actions to:

    a.    force Plaintiffs into accepting and paying supra-competitive transactional and penalty fees;

    b.    reduce, limit and foreclose merit competition in the CNP Payment Card Market; and

    c.    injure and eliminate competition in the CNP Payment Card Market.

232. The contract, combination, conspiracy and agreement have had and/or are likely to have among other things, the following effects:

    a.    actual and potential competition in the CNP Payment Card Market has been injured, limited, reduced, restrained, suppressed and effectively foreclosed;

    b.    merchants in the Industry who unwillingly accept and pay Visa and its Co-Conspirators' supra-competitive transactional and penalty fees have paid or are likely to pay artificially inflated prices;

c.      actual and potential competitors of Visa and its Co-Conspirators have been effectively foreclosed from competing on the merits with Visa and its Co-Conspirators and injured in their business and property; and

d.      the customers of Plaintiffs have paid higher prices for all retail products and services by purchasing such products and services in the Industry and have been deprived of the benefits of a free, open, competitive and unrestrained CNP Payment Card Market.

233.    As a result of Visa and its Co-Conspirators' violations of Section 1 as set forth in all previous paragraphs above, Plaintiffs have been injured in their business and property in an amount not presently known with precision, but which is, at a minimum, hundreds of millions of dollars, prior to trebling.

234.    Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted.  Plaintiffs have no adequate remedy at law.

### NINTH CLAIM FOR RELIEF
### PLAINTIFFS AGAINST MASTERCARD
### VIOLATION OF SHERMAN ACT § 1

235.    Plaintiffs incorporate and reallege the previous paragraphs as if fully set out herein.

236.    Beginning in or about 1979, the exact date unknown by Plaintiffs, and continuing thereafter until filing of this Complaint, MasterCard and its Co-Conspirators have continually engaged in an unlawful contract, combination, conspiracy and agreement in unreasonable restraint of interstate trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, including forced and coerced contracts and agreements with Plaintiffs requiring them to pay supra-competitive transactional and penalty fees in the CNP Payment Card Market.

237. The contract, combination and conspiracy have consisted of a continuing agreement, understanding and concert of action among MasterCard and its Co-Conspirators, and forced contracts and agreements with Plaintiffs, the substantial purpose of which has been to profit from fraud conducted in the Industry while breaching their contractual and statutory duties to Plaintiffs, who agree, albeit under coercion and/or unwittingly, to pay such supra-competitive transactional and penalty fees.

238. At all times, MasterCard and its Co-Conspirators have a monopoly power and/or market power and/or economic power in the relevant CNP Payment Card Market, sufficient to force Plaintiffs to accept and pay such supra-competitive transactional and penalty fees.

239. The continued employment of the supra-competitive transactional and penalty fees in the CNP Payment Card Market achieves no legitimate efficiency benefit to counterbalance its demonstrated anticompetitive effect of foreclosing merit competition in the CNP Payment Card Market.

240. Plaintiffs were forced by MasterCard and its Co-Conspirators to accept and pay such supra competitive transactional and penalty fees.

241. The ability of Plaintiffs to accept and pay superior and less costly transactional and penalty fees were effectively and substantially reduced, limited and foreclosed.

242. The contract, combination, conspiracy and agreement have been effectuated by the means and overt acts set forth above, among others.

243. MasterCard and its Co-Conspirators and others acting in concert with them intended by their actions to:

    a.    force Plaintiffs into accepting and paying supra-competitive transactional and penalty fees;

b.    reduce, limit and foreclose merit competition in the CNP Payment Card Market; and

c.    injure and eliminate competition in the CNP Payment Card Market.

244.    The contract, combination, conspiracy and agreement have had and/or are likely to have among other things, the following effects:

a.    actual and potential competition in the CNP Payment Card Market has been injured, limited, reduced, restrained, suppressed and effectively foreclosed;

b.    merchants in the Industry who unwillingly accept and pay MasterCard and its Co-Conspirators' supra-competitive transactional and penalty fees have paid or are likely to pay artificially inflated prices;

c.    actual and potential competitors of MasterCard and its Co-Conspirators have been effectively foreclosed from competing on the merits with MasterCard and its Co-Conspirators and injured in their business and property; and

d.    the customers of Plaintiffs have paid higher prices for all retail products and services by purchasing such products and services in the Industry and have been deprived of the benefits of a free, open, competitive and unrestrained CNP Payment Card Market.

245.    As a result of MasterCard and its Co-Conspirators' violations of Section 1 as set forth in all previous paragraphs above, Plaintiffs have been injured in their business and property in an amount not presently known with precision, but which is, at a minimum, hundreds of millions of dollars, prior to trebling.

246.    Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted. Plaintiffs have no adequate remedy at law.

## TENTH CLAIM FOR RELIEF
## PLAINTIFFS AGAINST VISA AND MASTERCARD
## VIOLATION OF SHERMAN ACT § 1

247.    Plaintiffs incorporate and reallege the previous paragraphs as if fully set out herein.

248.    Beginning in or about 1979, the exact date unknown by Plaintiffs, and continuing thereafter until filing of this Complaint, Visa and MasterCard and their Co-Conspirators have continually engaged in an unlawful contract, combination, conspiracy and agreement in unreasonable restraint of interstate trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, including forced and coerced contracts and agreements with Plaintiffs requiring them to pay supra-competitive transactional and penalty fees in the CNP Payment Card Market.

249.    The contract, combination and conspiracy have consisted of a continuing agreement, understanding and concert of action among Visa and MasterCard and their Co-Conspirators, and forced contracts and agreements with Plaintiffs, the substantial purpose of which has been to profit from fraud conducted in the Industry while breaching their contractual and statutory duties to Plaintiffs, who agree, albeit under coercion and/or unwittingly, to pay such supra-competitive transactional and penalty fees.

250.    At all times, Visa and MasterCard and their Co-Conspirators have a monopoly power and/or market power and/or economic power in the relevant CNP Payment Card Market, sufficient to force Plaintiffs to accept and pay such supra-competitive transactional and penalty fees.

251.    The continued employment of the supra-competitive transactional and penalty fees in the CNP Payment Card Market achieves no legitimate efficiency benefit to

counterbalance its demonstrated anticompetitive effect of foreclosing merit competition in the CNP Payment Card Market.

252. Plaintiffs were forced by Visa and MasterCard and their Co-Conspirators to accept and pay such supra competitive transactional and penalty fees.

253. The ability of Plaintiffs to accept and pay superior and less costly transactional and penalty fees were effectively and substantially reduced, limited and foreclosed.

254. The contract, combination, conspiracy and agreement have been effectuated by the means and overt acts set forth above, among others.

255. Visa and MasterCard and their Co-Conspirators and others acting in concert with them intended by their actions to:

    a.    force Plaintiffs into accepting and paying supra-competitive transactional and penalty fees;

    b.    reduce, limit and foreclose merit competition in the CNP Payment Card Market; and

    c.    injure and eliminate competition in the CNP Payment Card Market.

256. The contract, combination, conspiracy and agreement have had and/or are likely to have among other things, the following effects:

    a.    actual and potential competition in the CNP Payment Card Market has been injured, limited, reduced, restrained, suppressed and effectively foreclosed;

    b.    merchants in the Industry who unwillingly accept and pay Visa and MasterCard and their Co-Conspirators' supra-competitive transactional and penalty fees have paid or are likely to pay artificially inflated prices;

c. actual and potential competitors of Visa and MasterCard and their Co-Conspirators have been effectively foreclosed from competing on the merits with Visa and MasterCard and their Co-Conspirators and injured in their business and property; and

d. the customers of Plaintiffs have paid higher prices for all retail products and services by purchasing such products and services in the Industry and have been deprived of the benefits of a free, open, competitive and unrestrained CNP Payment Card Market.

257. As a result of Visa and MasterCard and their Co-Conspirators' violations of Section 1 as set forth in all previous paragraphs above, Plaintiffs have been injured in their business and property in an amount not presently known with precision, but which is, at a minimum, hundreds of millions of dollars, prior to trebling.

258. Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted. Plaintiffs have no adequate remedy at law.

### ELEVENTH CLAIM FOR RELIEF
### PLAINTIFFS AGAINST VISA
### VIOLATION OF SHERMAN ACT § 2

259. Plaintiffs incorporate and reallege the previous paragraphs as if fully set out herein.

260. Visa and its Co-Conspirators, through the combination of their enterprise and the implementation and enforcement of their rules and regulations explained herein, have unreasonably restrained competition by creating, enhancing and maintaining their monopoly in the CNP Payment Card Market by the improper and illegal means outlined above, which resulted in an unreasonable restraint on competition.

261. Visa and its Co-Conspirators' conduct constitute an unreasonable restraint on trade and actual and threatened monopolization in violation of Sherman Act § 2.

Case 5:03-cv-00372-BO   Document 1   Filed 05/20/03   Page 65 of 93

262. The effect of Visa and its Co-Conspirators' unreasonable restraints on trade and monopolization adversely affects competition in a substantial portion of interstate commerce.

263. As a result of Visa and its Co-Conspirators' conduct as set forth in all previous paragraphs above, Plaintiffs have been injured in its trade or business, in an amount not presently known with precision, but which is, at a minimum, hundreds of millions of dollars, prior to trebling.

264. Such violations and the effects thereof are continuing and will continue unless the injunctive relief requested herein is granted. Plaintiffs have no adequate remedy at law.

## TWELFTH CLAIM FOR RELIEF
## PLAINTIFFS AGAINST MASTERCARD
## <u>VIOLATION OF SHERMAN ACT § 2</u>

265. Plaintiffs incorporate and reallege the previous paragraphs as if fully set out herein.

266. MasterCard and its Co-Conspirators, through the combination of their enterprise and the implementation and enforcement of their rules and regulations explained herein, have unreasonably restrained competition by creating, enhancing and maintaining their monopoly in the CNP Payment Card Market by the improper and illegal means outlined above, which resulted in an unreasonable restraint on competition.

267. MasterCard and its Co-Conspirators' conduct constitute an unreasonable restraint on trade and actual and threatened monopolization in violation of Sherman Act § 2.

268. The effect of MasterCard and its Co-Conspirators' unreasonable restraints on trade and monopolization adversely affects competition in a substantial portion of interstate commerce.

269. As a result of MasterCard and its Co-Conspirators' conduct as set forth in all previous paragraphs above, Plaintiffs have been injured in its trade or business, in an amount not presently known with precision, but which is, at a minimum, hundreds of millions of dollars, prior to trebling.

270. Such violations and the effects thereof are continuing and will continue unless the injunctive relief requested herein is granted. Plaintiffs have no adequate remedy at law.

### THIRTEENTH CLAIM FOR RELIEF
### PLAINTIFFS AGAINST VISA AND MASTERCARD
### VIOLATION OF SHERMAN ACT § 2

271. Plaintiffs incorporate and reallege the previous paragraphs as if fully set out herein.

272. Visa and MasterCard and their Co-Conspirators, through the combination of their enterprise and the implementation and enforcement of their rules and regulations explained herein, have unreasonably restrained competition by creating, enhancing and maintaining their monopoly in the CNP Payment Card Market by the improper and illegal means outlined above, which resulted in an unreasonable restraint on competition.

273. Visa and MasterCard and their Co-Conspirators' conduct constitute an unreasonable restraint on trade and actual and threatened monopolization in violation of Sherman Act § 2.

274. The effect of Visa and MasterCard and their Co-Conspirators' unreasonable restraints on trade and monopolization adversely affects competition in a substantial portion of interstate commerce.

275. As a result of Visa and MasterCard and their Co-Conspirators' conduct as set forth in all previous paragraphs above, Plaintiffs have been injured in their trade or business, in

an amount not presently known with precision, but which is, at a minimum, hundreds of millions of dollars, prior to trebling.

276. Such violations and the effects thereof are continuing and will continue unless the injunctive relief requested herein is granted. Plaintiffs have no adequate remedy at law.

## FOURTEENTH CLAIM FOR RELIEF
## PLAINTIFFS AGAINST VISA AND MASTERCARD
## VIOLATION OF STATE ANTI-TRUST LAWS

277. Plaintiffs incorporate and reallege the previous paragraphs as if fully set out herein.

278. Each of the acts complained of in the seventh through twelfth claims of relief also violate antitrust acts under state law. Under such state law, Plaintiffs are entitled to recover equitable and/or compensatory damages, and under certain state laws, treble damages, Plaintiffs' reasonable attorneys' fees and costs, for their injuries caused by the wrongful conduct of Visa and MasterCard and their Co-Conspirators, individually, and jointly.

279. As a result of Visa and MasterCard and their Co-Conspirators' violations of such state antitrust laws as set forth in all previous paragraphs above, Plaintiffs have been injured in their business and property in an amount not presently known with precision, but which is, at a minimum, hundreds of millions of dollars, prior to trebling.

280. Such violation and the effects thereof are continuing and will continue unless the injunctive relief requested is granted. Plaintiffs have no adequate remedy at law.

## FIFTEENTH CLAIM OF RELIEF
## PLAINTIFFS AGAINST ALL DEFENDANTS
## BREACH OF CONTRACT AGAINST ALL DEFENDANTS

281. Plaintiffs incorporate and reallege the previous paragraphs as if fully set out herein.

282.    Defendants and Plaintiffs entered into a Merchant Agreement.

283.    Under the Merchant Agreement, Defendants have an absolute duty to perform their contractual and statutory duties, adhere to sound banking practices, act seasonably, and disclose all terms and conditions of the performance of such duties.

284.    Defendants have willfully and negligently breached their Merchant Agreement with each respective Plaintiff by failing to perform their contractual and statutory duties, failing to adhere to sound banking practices, failing to take seasonable action, and concealing and misrepresenting the terms and conditions of their services.

285.    Plaintiffs have been damaged by Defendants breach of the Merchant Agreement because they, and they alone, have been solely responsible for all costs to online fraud in the Industry while Defendants have made millions of dollars from fraud in the Industry.  Moreover, Defendants have a statutory duty to ensure that they have policies and procedures in place that they abided by to assist the Industry in preventing fraud.  At all times, Defendants did not operate under such policies and procedures, and Defendants knew or should have known this fact and should have exercised ordinary care in fulfilling their contractual and statutory obligations. Instead, Defendants placed profits above such duties.

286.    Furthermore, Defendants misrepresented their fees that they debited from Plaintiffs' merchant accounts.  At all times, Defendants never disclosed their rules and regulations in which they claim that they are entitled to debit such fees from Plaintiffs' merchant account and Defendants knew or should have know these facts and should have disclosed such fees at the time of contracting with Plaintiffs.

287.    Additionally, Defendants have failed to act seasonably in the presentment and notice of dishonor of a payment/credit card.

288.     As a direct and proximate cause of Defendants' breach of their Merchant Agreement with each respective Plaintiff as set forth in all previous paragraphs above, Plaintiffs have been injured in their trade or business, in an amount not presently known with precision, but which is, at a minimum, hundreds of millions of dollars, prior to trebling.

289.     Such violations and the effects thereof are continuing and will continue unless the injunctive relief requested herein is granted. Plaintiffs have no adequate remedy at law.

### SIXTEENTH CLAIM FOR RELIEF
### PLAINTIFFS AGAINST DEFENDANTS
### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

290.     Plaintiffs incorporate and reallege the previous paragraphs as if fully set out herein.

291.     State contract law imposes a covenant of good faith and fair dealing in every contract.

292.     As a third party beneficiary under the contract between Plaintiffs and Co-Conspirators, or alternatively, as a principal of an issuing bank and implied party under the subject Merchant Agreement, Defendants have an obligation under state law to fulfill their obligation under the Merchant Agreement and their respective rules and regulations fairly and in good faith.

293.     As more particularly described above, Defendants have breached their obligation of good faith and fair dealing in a variety of ways.

294.     First, Defendants violated their obligation of good faith and fair dealing by miscalculating Plaintiffs' Chargeback Fee Ratio, and by including disputed Chargeback Fees, reversed Chargeback Fees on CVV2 and AVS authenticated transactions, in the calculation of excess Chargeback Fees.

295. Second, in agreeing to accept valid charges under the Merchant Agreement, Defendants have an obligation to Plaintiffs to disclose that credit or debit card that Plaintiffs have inquired about has been lost, compromised, stolen or misused (much as they have done in the brick and mortar world).

296. Despite that obligation, Defendants are only now beginning to introduce measures that would shift the burden of proving the validity of a transaction to the consumer and away from the merchant.

297. The obligation of good faith and fair dealing imposes an obligation upon Defendants to develop standards and procedures for authenticating and validating online transactions, which obligation Defendants have failed to fulfill.

298. As a result of Defendants' breach of their obligation of good faith and fair dealing as set forth in all previous paragraphs above, Plaintiffs have been injured in their trade or business, in an amount not presently known with precision, but which is, at a minimum, hundreds of millions of dollars, prior to trebling.

299. Such violations and the effects thereof are continuing and will continue unless the injunctive relief requested herein is granted. Plaintiffs have no adequate remedy at law.

### SEVENTEENTH CLAIM FOR RELIEF
### PLAINTIFFS AGAINST ALL DEFENDANTS
### BREACH OF A DUTY OF ORDINARY CARE

300. Plaintiffs incorporate and reallege the previous paragraphs as if fully set out herein.

301. Defendants and Plaintiffs entered into a Merchant Agreement.

302. Under the Merchant Agreement, there existed an absolute duty of ordinary care flowing from Defendants to Plaintiffs.

303. Defendants breached this duty of ordinary care by failing to perform their statutory duties, failing to adhere to sound banking practices, failing to take seasonable action, and concealing and misrepresenting the terms and conditions of their services.

304. Moreover, Defendants failed to exercise ordinary care by failing to give notice to Plaintiffs of potential or actual misuse of a credit or debit card. Defendants are in a superior position than Plaintiffs as a banking institution to prevent fraud in the Industry and should disclose to Plaintiffs that a credit or debit card has been lost, compromised, stolen or misused when Defendants are on notice of such possible problems. However, Defendants have failed to exercise this duty of care.

305. Furthermore, Defendants have a duty to exercise reasonable care and diligence in performing a "necessary investigation" of each credit application received and this investigation of each application must occur prior to the issuance of credit. Defendants have continuously issued credit through their respective credit and debit cards to individuals and entities that have a history of conducting fraudulent transactions, or have fraudulently applied for such credit under false pretenses.

306. Additionally, Defendants have failed to act seasonably in the presentment and notice of dishonor of an item, but yet they still have issued a Chargeback Fee to Plaintiffs when they failed to act seasonably.

307. Plaintiffs have been damaged by Defendants breach of their duty of care because they, and they alone, have been solely responsible for all costs to online fraud in the Industry while Defendants have made millions of dollars from fraud in the Industry. Moreover, Defendants have a statutory duty to ensure that they have policies and procedures in place that they abided by to assist the Industry in preventing fraud. At all times, Defendants did not

operate under such policies and procedures, and Defendants knew or should have known this fact and should have exercised ordinary care in fulfilling their statutory obligations. Instead, Defendants placed profits above such duties.

308. As a direct and proximate cause of Defendants' breach of their Merchant Agreement with each respective Plaintiff, Plaintiffs have been injured in their trade or business as set forth in all previous paragraphs above, in an amount not presently known with precision, but which is, at a minimum, hundreds of millions of dollars, prior to trebling.

309. Such violations and the effects thereof are continuing and will continue unless the injunctive relief requested herein is granted. Plaintiffs have no adequate remedy at law.

## EIGHTEENTH CLAIM FOR RELIEF
## PLAINTIFFS AGAINST ALL DEFENDANTS
## BREACH OF FIDUCIARY DUTY

310. Plaintiffs incorporate and reallege the previous paragraphs as if fully set out herein.

311. Defendants owed a fiduciary duty to Plaintiffs to disclose that any and all credit or debit cards that have been lost, compromised, stolen or misused because Defendants have direct and/or constructive knowledge of such facts and patterns.

312. Prior to processing each transaction, Plaintiffs contact Defendants or their Co-Conspirators to conduct their authentication requirements.

313. However, Defendants routinely and continuously failed and continue to fail to disclose to Plaintiffs that a credit or debit card has been lost, compromised, stolen or misused. As a result of their breach of fiduciary duty, Defendants have made millions of dollars from Plaintiffs from penalty fees resulting from fraudulent transaction in which they have direct and/or constructive knowledge prior to the occurrence of such transaction that the credit or debit

card had been lost, compromised, stolen or misused. Moreover, Plaintiffs have now way of knowing whether or not a credit or debit card had been lost, compromised, stolen or misused, or whether there existed a pattern of fraudulent activity with a specific credit or debit card.

314. As a direct and proximate cause of Defendants' breach of their fiduciary duty to Plaintiffs as set forth in all previous paragraphs above, Plaintiffs have been injured in their trade or business, in an amount not presently known with precision, but which is, at a minimum, hundreds of millions of dollars, prior to trebling.

315. Such violations and the effects thereof are continuing and will continue unless the injunctive relief requested herein is granted. Plaintiffs have no adequate remedy at law.

**NINETEENTH CLAIM FOR RELIEF**
**PLAINTIFFS AGAINST ALL DEFENDANTS**
**NEGLIGENT MISREPRESENTATION**

316. Plaintiffs incorporate and reallege the previous paragraphs as if fully set out herein.

317. Defendants knowingly accepted money from Plaintiffs as fees associated with fighting fraud in the Industry and benefited from the receipt of such payment and knew or should have known that such anti-fraud measures were not being taken, or alternatively not at the level in which they should be, through Defendants reckless and/or negligent acts. Based upon the foregoing, Defendants are liable to the Plaintiff and the class for negligent misrepresentation.

318. As a direct and proximate cause of Defendants' negligent representation as set forth in all previous paragraphs above, Plaintiffs have been injured in their trade or business, in an amount not presently known with precision, but which is, at a minimum, hundreds of millions of dollars, prior to trebling.

319.   Such violations and the effects thereof are continuing and will continue unless the injunctive relief requested herein is granted. Plaintiffs have no adequate remedy at law.

## TWENTIETH CLAIM FOR RELIEF
## PLAINTIFFS AGAINST ALL DEFENDANTS
## FRAUD AND/OR DECEIT

320.   Plaintiffs incorporate and reallege the previous paragraphs as if fully set out herein.

321.   Defendants' conduct, as described above, was undertaken with fraud and deceit (and/or negligent misrepresentation as set forth above). Plaintiffs were debited for transactional and penalty fees which did not occur or which such transactional and penalty fees were never disclosed to Plaintiffs at the time of contracting. Plaintiffs and/or the class were charged higher transactional and penalty fees than "brick and mortar" merchants because such higher fees were allegedly for anti-fraud-related services. However, Defendants did not and do not provide such services to Plaintiffs. In fact, as noted above, Defendants take no responsibility for fraud in the Industry and breach their contractual and statutory duties owed to Plaintiffs in failing to inform them of credit or debit card had been lost, compromised, stolen or misused.

322.   As a result of failing to provide such services and duties owed to Plaintiffs, Defendants have obtained Plaintiffs' property through fraud and deceit. Defendants acted recklessly and/or with fraud or deceit and/or in reckless disregard of the interests of Plaintiffs and aided and abetted fraud in the Industry.

323.   As a direct and proximate cause of Defendants' breach of fraud and/or deceit, Plaintiffs have been injured in their trade or business as set forth in all previous paragraphs above, in an amount not presently known with precision, but which is, at a minimum, hundreds of millions of dollars, prior to trebling.

324.    Such violations and the effects thereof are continuing and will continue unless the injunctive relief requested herein is granted. Plaintiffs have no adequate remedy at law.

## TWENTY-FIRST CLAIM FOR RELIEF
## PLAINTIFFS AGAINST DEFENDANTS
## CIVIL CONSPIRACY

325.    Plaintiffs incorporate and reallege the previous paragraphs as if fully set out herein.

326.    Each of the acts complained of in the first seven claims for relief also violate civil conspiracy statutes under state law.

327.    Additionally, and upon information and belief, Defendants compensates $70 of every $100 Chargeback Fee fine to their Co-Conspirators that initiate the Chargeback Fee on behalf of the consumer.  Thus, Defendants give an incentive to their Co-Conspirators to initiate Chargeback Fees where no Chargeback Fees may be appropriate or warranted.

328.    Upon information and belief, Defendants (who control the issuing banks) have conspired with their Co-Conspirators to create and/or process Chargeback Fees to Plaintiffs in order to levy significant fines even where no Chargeback Fee is justified or warranted.

329.    As a result and proximate cause of this conspiracy as set forth in all previous paragraphs above, Plaintiffs have been injured in their trade or business, in an amount not presently known with precision, but which is, at a minimum, hundreds of millions of dollars, prior to trebling.

330.    Such violations and the effects thereof are continuing and will continue unless the injunctive relief requested herein is granted. Plaintiffs have no adequate remedy at law.

## TWENTY-SECOND CLAIM FOR RELIEF
## PLAINTIFFS AGAINST DEFENDANTS
## CIVIL THEFT

331. Plaintiffs incorporate and reallege the previous paragraphs as if fully set out herein.

332. By unlawfully debiting Plaintiffs' bank account (or causing such account to be debited) for an amount not presently known with precision, but which is, at a minimum, hundreds of millions of dollars, Defendants have knowingly obtained Plaintiffs' property with intent to, either temporarily or permanently, deprive Plaintiffs of their right to such property. Alternatively, by debiting Plaintiffs' accounts through the imposition of penalties under Defendants Rules and Regulations, Defendants have appropriated Plaintiffs' property for their own use or for the use of their members who are similarly not entitled to such funds.

333. Moreover, Defendants conduct, as mentioned above, has aided and abetted theft in the Industry.

334. Visa's actions in so debiting, or causing to be debited, Plaintiffs' account constitutes theft under state law, and accordingly civil theft under state law.

335. As a result and proximate cause of this theft as set forth in all previous paragraphs above, Plaintiffs have been injured in their trade or business, in an amount not presently known with precision, but which is, at a minimum, hundreds of millions of dollars, prior to trebling.

336. Such violations and the effects thereof are continuing and will continue unless the injunctive relief requested herein is granted. Plaintiffs have no adequate remedy at law.

## TWENTY-THIRD CLAIM FOR RELIEF
## PLAINTIFFS AGAINST DEFENDANTS
## UNFAIR DECEPTIVE TRADE PRACTICES

337.    Plaintiffs incorporate and reallege the previous paragraphs as if fully set out herein.

338.    This is an action for damages and injunctive relief under either unfair, deceptive, illegal or fraudulent business acts under state law.

339.    The harm to Plaintiff outweighs the utility of Defendants' policies and practices and, consequently, said conduct as alleged hereinabove, constitutes either unfair, deceptive, illegal or fraudulent business acts or practices within the meaning of unfair competition statutes under state law and/or state common law.

340.    Each of said acts committed by Defendants alleged hereinabove, including but not limited to deceptive advertising, is either unfair, illegal (*i.e.*, a violation of the state and federal antitrust laws) or deceptive, and in violation of the public policy of a state, and have damaged Plaintiffs in their business and property. Said acts of unfair competition and/or deceptive trade practices are on going and Plaintiffs are entitled to an injunction enjoining said conduct.

341.    Plaintiffs are entitled to recover the ill-gotten gains including the monopolistic profits earned by Defendants as a result of their acts of unfair competition, and is entitled to the disgorgement of said ill gotten gains and profits and the recovery or restitution thereof, pursuant to both principles of common law and unfair competition statutes both in Plaintiffs' own individual capacity and as private attorneys general on behalf of the general public, including public and private entities which have been charged monopoly supra-competitive prices for payment card services by Defendants, and the consumers who have been forced to pay the costs of Defendants' monopolistic profits in the form of higher prices.

342.     As a result of Defendants' unlawful unfair competition as set forth in all previous paragraphs above, Plaintiffs have been damaged in their business or property, as alleged herein, in an amount not presently known with precision, but which is, at a minimum, hundreds of millions of dollars, prior to trebling.

343.     Such violations and the effects thereof are continuing and will continue unless the injunctive relief requested herein is granted. Plaintiffs have no adequate remedy at law.

### TWENTY-FOURTH CLAIM FOR RELIEF
### PLAINTIFFS AGAINST DEFENDANTS
### ADHESION CONTRACT

344.     Plaintiffs incorporate and reallege the previous paragraphs as if fully set out herein.

345.     Defendants acted deliberately to conspire to create adhesion agreements with Plaintiffs.  Defendants are estimated to control over 96% of the sale orders in the Industry. Defendants are able to charge substantially different prices to merchants in the Industry because such merchants must accept credit and debit cards under any terms because their customers insist on using those cards.

346.     As a result of Defendants' adhesion contract as set forth in all previous paragraphs above, Plaintiffs have been injured in their trade or business, in an amount not presently known with precision, but which is, at a minimum, hundreds of millions of dollars, prior to trebling.

347.     Such violations and the effects thereof are continuing and will continue unless the injunctive relief requested herein is granted. Plaintiffs have no adequate remedy at law.

## TWENTY-FIFTH CLAIM FOR RELIEF
## PLAINTIFFS AGAINST DEFENDANTS
## DENIAL OF FAIR PROCEDURE

348. Plaintiffs incorporate and reallege the previous paragraphs as if fully set out herein.

349. Plaintiffs in the Industry rarely are successful re-presenting a disputed transaction to the Issuing Bank and Defendants' Issuing Banks allow the cardholder several opportunities to dispute the transaction.

350. Moreover, Defendants admit that there are no methods or required facts that a Plaintiff needs to argue to successfully dispute a cardholder's claim that a purchase was not made. Thus, Plaintiffs generally are not able to successfully re-present and reverse a Chargeback Fee and are denied fair procedure as a matter of law.

351. Additionally, the practices of Defendants as outlined herein of refusing to communicate directly with Plaintiffs and other similarly situated merchants regarding matters in which Defendants' decisions will directly affect such merchant's trade, business and/or property rights amounts to an unlawful denial of fair procedure. In particular, Plaintiffs and other similarly situated merchants have been denied the opportunity to present countervailing evidence and arguments in connection with Defendants' effort to impose fines, penalties, fees or extraordinary charges in connection with such merchant's participation in the CNP Payment Card Market.

352. As a result of Defendants' unlawful acts and practices as set forth in all previous paragraphs above, Plaintiffs have been damaged in their business or property, as alleged herein, in an amount not presently known with precision, but which is, at a minimum, hundreds of millions of dollars, prior to trebling.

353. Such violations and the effects thereof are continuing and will continue unless the injunctive relief requested herein is granted. Plaintiffs have no adequate remedy at law.

## TWENTY-SIXTH CLAIM FOR RELIEF
## PUNITIVE DAMAGES

354. Plaintiffs incorporate and reallege the previous paragraphs as if fully set out herein.

355. Defendants acted with deliberate and/or reckless disregard for the rights of Plaintiffs. These acts were willful and/or wanton or reckless for their own self-interest. Defendants should be held liable for punitive damages.

## TWENTY-SEVENTH CLAIM FOR RELIEF
## DECLARATORY RELIEF

356. Plaintiffs incorporate and reallege the previous paragraphs as if fully set out herein.

357. This is an action seeking a declaration of Plaintiffs' rights under Defendants' Rules and Regulations pursuant to 28 U.S.C. § 2201 and under state law.

358. There is presently a real and justiciable controversy between the parties concerning a variety of issues.

359. First, despite the fact that the parties' relationship is governed by Defendants' Rules and Regulations, and despite Plaintiffs' repeated demands to be provided with a copy of such rules and regulations, Defendants refuse to publicize such rules and regulations. Accordingly, Plaintiffs are unsure of their rights in general under Defendants' Rules and Regulations and whether such rules and regulations are even binding on Plaintiffs.

360. Second, Plaintiffs claims that Defendants' calculations of Chargeback Ratios improperly compares Chargebacks in a given month against transactions processed during the

same month even though the Chargebacks relate to transactions occurring in a different month. Thus, Defendants' calculations of their Chargebacks Ratio does not reflect an accurate percentage of Chargebacks to total transaction. As a result of Defendants' miscalculations, Plaintiffs were subject to penalties in an amount not presently known with precision, but which is, at a minimum, hundreds of millions of dollars, which amount was directly debited from Plaintiffs' bank account.

361. Third, effective January 1, 2001, Visa arbitrarily lowered the international Chargeback Ratio for Plaintiffs from 5% to 2-½ % even though Plaintiffs apparently do not fall within the category of merchants subject to the reduced ratio. This reduced ratio and the accompanying higher discount rate should not apply to Plaintiffs.

362. Fourth, Defendants have arbitrary imposed penalty fees on certain Plaintiffs, not simply those penalty fees stated in their rules and regulations. As a result of imposing such arbitrary penalty fees, Plaintiffs have been exposed to significant losses and the further arbitrary application of Defendants' Rules and Regulations. Under such rules and regulations, penalties, if imposed at all, should only be imposed when specifically stated in the Merchant Agreement.

363. Fifth, under state law, liquidated damages are only permissible where it is intended to compensate a party for the other party's failure to perform. Liquidated damages that operate as a penalty are unenforceable.

364. For all the reasons set forth above, Plaintiffs are unsure of their rights under Defendants' Rules and Regulations, under state law, and under the subject Merchant Agreement. Accordingly, declaratory relief under 28 U.S.C. § 2201 is warranted.

WHEREFORE, Plaintiffs respectfully requests that this Court enter a judgment against Defendants declaring the following:

A. That as a result of Defendants' failure to provide Plaintiffs with a copy of the Visa Rules and Regulations, Defendants' imposition of any penalties and fines thereunder are unwarranted and must be reversed;

B. That Defendants' Chargeback Ratio calculation improperly compares the number of Chargebacks against total sales occurring in different time periods and that all fines imposed as a result of such improper comparison be reversed;

C. That Defendants' Chargeback Ratio calculation improperly considers Chargebacks on transactions which are later verified, and that all such verified transactions be excluded from the calculation of excessive Chargebacks;

D. That Defendants' Chargeback Ratio improperly considers Chargebacks occurring after Plaintiffs have specifically notified the card issuer that the customer's transaction has been cancelled and a credit has been issued to the customer's account;

E. That Visa's Chargeback fines constitute unlawful liquidated damage penalties under state law;

F. That Defendants be required to refund (or cause to be refunded) any and all unlawful charges, fines and penalties imposed against Plaintiffs; and

G. That Plaintiffs be awarded costs incurred in bringing this action.

## TWENTY-EIGHTH CLAIM FOR RELIEF
## INJUNCTIVE RELIEF

365. This is an action seeking injunctive relief against Defendants pursuant to Fed. R. Civ. P. 65.

366. Plaintiffs incorporate and reallege the previous paragraphs as if fully set out herein.

367. As more fully and particularly set forth above, Defendants have imposed (and threatens to impose) substantial fines and penalties against Plaintiffs under their respective Rules and Regulations.

368. Additionally, Plaintiffs are concerned that Defendants' actions will now result in a termination of Plaintiffs' Merchant Agreement, which will in turn effectively put Plaintiffs out of business.

369. Defendants' actions have resulted in, and are continuing to cause Plaintiffs irreparable harm, which can only be avoided through the issuance of appropriate injunctive relief.

WHEREFORE, Plaintiffs respectively requests that this Court enter an injunction requiring the following:

    A.    Defendants refrain from imposing additional unlawful fines and penalty fees against Plaintiffs under their respective rules and regulations;

    B.    Defendants refrain from any retaliatory actions against Plaintiffs, including canceling or causing the canceling of their respective merchant account and/or Merchant Agreement, for filing this action against Defendants while this lawsuit is pending;

    C.    Defendants send a copy of their rules and regulations to Plaintiffs;

    D.    Defendants require their cardholders to return purchased products and/or services before Defendants have the authority to cancel the transaction and issue a Chargeback Fee to Plaintiffs;

    E.    Defendants send to Plaintiffs, along with the date of the charge, amount of the charge and credit card number, the customer name and product/service purchased by such customer when notifying Plaintiffs of a Chargeback; and

F.    Granting such other and further relief deemed just and proper.

## TWENTY-NINTH CLAIM FOR RELIEF
## INJUNCTIVE RELIEF FOR COMPROMISED AND STOLEN CREDIT CARD

370.    Plaintiffs incorporate and reallege the previous paragraphs as if fully set out herein.

371.    Defendants notified their member financial institutions of more than eight million credit card accounts that were stolen or jeopardized in February 2003. Defendants decided not to cancel and reissue such credit and debit cards, but instead, told their member financial institutions of their breach so that they may monitor each account for fraud and/or reissue cards as appropriate.    In other words, if a fraudulent transaction is reported from one of these compromised credit or debit cards, Defendants will debit a Chargeback Fee against Plaintiffs' merchant account.

372.    According to credit card experts, if 8 million card accounts were affected, and all those cards were canceled with new cards issued in their place, it would cost Defendants an estimated $200 million.

373.    Plaintiffs note that if it costs Defendants $200 million to replace them, but if each credit card gets only one Chargeback Fee of $45, Defendants will make $360 million in revenues. Direct and circumstantial evidence shows that Defendants elected not to spend $200 million, but rather elected to put themselves in a position to gain million in revenues.

374.    Plaintiffs have reason and belief that there have been additional breaches in the past and as of the filing of this Complaint. In such situations, Defendants do not cancel and reissue stolen or jeopardized credit and debit cards.

375. Defendants' actions have resulted in, and are continuing to cause Plaintiffs irreparable harm, which can only be avoided through the issuance of appropriate and immediate temporary, preliminary and permanent injunctive relief.

WHEREFORE, Plaintiffs respectively requests that this Court enter an injunction requiring Defendants and their Co-Conspirators to:

A.     disclose to Plaintiffs during their discussion at the authentication process that the specific card or debit card that Plaintiffs are inquiring about has been compromised if that specific credit or debit card number has been compromised by means of fraud, theft, security breach, computer "hacking" or otherwise;

B.     with respect to all such compromised card numbers, decline all requests for sales authorization by any merchant operating in the Industry; and

C.     cancel all compromised credit and/or debit cards.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment against all Defendants jointly and severally, as follows:

Pursuant to the provisions of 18 U.S.C. § 1964, that this Court issue an Order and Judgment, jointly and severally, against Defendants, providing the following relief:

1.     That this Court certify a class of Plaintiffs as defined in Section V. above, under Rule 23(b)(2) and/or 23(b)(3) of the Federal Rules of Civil Procedure.

2.     Actual damages in an amount not presently known with precision but which is, at a minimum, hundreds of millions dollars, prior to trebling.

3.     Treble damages.

4.     That, alternatively, this Court order that all of Defendants who are found to have violated above mentioned federal and state laws, disgorge the unjust enrichment derived from any such violation.

5.     That this Court award Plaintiffs the costs of this suit, including attorneys and experts fees, together with such other and further relief as may be necessary and appropriate to prevent and restrain further violations of 18 U.S.C. § 1962, and to end the ongoing wrongful conduct of Defendants.

6.     That this Court enters a judgment against Defendants declaring the following:

A.     That as a result of Defendants failure to provide Plaintiffs with a copy of the their Rules and Regulations, Defendants imposition of any penalties and fines there under are unwarranted and must be reversed;

B.     That Defendants' Chargeback Fee Ratio calculation improperly compares the number of Chargeback Fees against total sales occurring in different time periods and that all fines imposed as a result of such improper comparison be reversed;

C.     That Defendants' Chargeback Fee Ratio calculation improperly considers Chargeback Fees on transactions which are later verified, and that all such verified transactions be excluded from the calculation of excessive Chargeback Fees;

D.     That Defendants' Chargeback Fee Ratio improperly considers Chargeback Fees occurring after Plaintiffs have specifically notified the card issuer that the customer's transaction has been cancelled and a credit has been issued to the customer's account;

E.     That Visa and MasterCard's Chargeback Fee fines constitute unlawful liquidated damage penalties under state law;

F.      That Defendants be required to refund (or cause to be refunded) any and all unlawful charges, fines and penalties imposed against Plaintiffs; and

7.      That this Court enter an injunction against Defendants requiring them to:

A.      refrain from imposing additional unlawful fines and penalty fees and improper classification/coding against Plaintiffs under their respective rules and regulations;

B.      refrain from any retaliatory actions against Plaintiffs, including canceling or causing the canceling of their respective merchant account and/or Merchant Agreement, for filing this action against Defendants while this lawsuit is pending;

C.      send a copy of their respective rules and regulations to Plaintiffs;

D.      Defendants require their cardholders to return purchased products and/or services before Defendants have the authority to cancel the transaction and issue a Chargeback Fee to Plaintiffs;

E.      Defendants send to Plaintiffs, along with the date of the charge, amount of the charge and credit card number, the customer name and product/service purchased by such customer when notifying Plaintiffs of a Chargeback; and

F.      disclose to Plaintiffs during their discussion at the authentication process that the specific card or debit card that Plaintiffs are inquiring about has been compromised if that specific credit or debit card number has been compromised by means of fraud, theft, security breach, computer "hacking" or otherwise;

G.      with respect to all such compromised card numbers, decline all requests for sales authorization by any merchant operating in the Industry; and

H.      cancel all compromised credit and/or debit cards.

8.      Such other relief as this Court deems proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all counts so triable.

DATED this 20th day of May, 2003.

Mark W. Ishman
Triangle Law Center, PLLC
2304 S. Miami Blvd., Suite 122
Durham, NC 27703
Telephone: (919) 942-1410
Facsimile: (919) 558-1154
E-mail: mishman@ishmanlaw.com

# BANK CARD MERCHANT
## APPLICATION AND AGREEMENT

for ☑ MasterCard ☑ VISA

Name of Merchant _Gerry L. Ginsburg dba Direct FX_ herein called the "Merchant"

Address _800 Summer St, Suite 315, Stamford, CT 06901_

is applying to become a Merchant and to participate in the MasterCard® and/or VISA® Programs offered by _NSS Bank_ , herein called the "Bank".

Bank Name and Address

Merchant's type of business _Currently Sales via Internet Marketing_ Bus. Tel _203-359-2420_

The undersigned Merchant understands that the Bank is a member of MasterCard International Incorporated ("MasterCard") which operates a bank card plan pursuant to which MasterCard cards are issued by member banks of MasterCard to selected persons who desire to avail themselves of the programs, services and credit facilities of such bank card plan and/or of VISA, USA, INC. ("VISA") which operates a bank card plan pursuant to which VISA Cards and other Qualified Cards, as defined in VISA's Operating Regulations, are issued by member banks of VISA to selected persons who desire to avail themselves of the programs, services and credit facilities of such bank card plan and that the Bank is authorized to enter into agreements with merchants. The MasterCard bank card plan and the VISA bank card plan are collectively referred to as the "Bank Card Plans" and the MasterCard cards and VISA and other Qualified Cards are collectively referred to as "Bank Cards". The Rules of MasterCard and the Regulations of VISA are collectively referred to as the "Rules". Merchant desires to participate in and obtain the benefits of one or both of the Bank Card Plans as indicated by check mark at the beginning of this Agreement. If Merchant's application is approved by the Bank, the Merchant and the Bank agree as follows:

**1. ADMINISTRATION OF BANK CARD PLANS.** Merchant understands that the Bank Card Plans are administered by MasterCard and VISA, which have each adopted Rules which are binding on the Bank and other member banks of MasterCard and VISA. Merchant agrees to comply with such Rules so far as they pertain to the Merchant, and such Rules as now in effect and as amended from time to time are hereby made a part of this Agreement as fully as if specifically set forth herein. Merchant understands that the Bank has made arrangements with NEW ENGLAND BANKCARD ASSOCIATION INC. ("NEBA") under which NEBA will perform certain authorization, bookkeeping and other services facilitating Bank's participation in the Bank Card Plans. Merchant agrees to comply with the Operating Rules of NEBA as now in effect and as amended from time to time and with any instructions issued by MasterCard, VISA, NEBA or the Bank governing honoringof Bank Cards, authorization procedures, preparation and presentation of sales drafts and credit vouchers, acceptance of chargebacks to the Merchant and other aspects of the Merchant's participation in the Bank Card Plans (such Operating Rules and instructions being collectively referred to as "Instructions"). Any such Instructions issued from time to time are hereby made a part of this Agreement as fully as if specifically set forth herein.

**2. MUTUAL UNDERTAKINGS.** Merchant agrees to honor Bank Cards issued by any member bank of MasterCard and/or VISA, as indicated by check mark at the beginning of this Agreement, all in a manner and on the terms set forth in the Rules or in any Instructions. Bank agrees to accept from the Merchant Sales Slips and Credit Slips generated through the use of such Bank Cards arising from transactions between the Merchant and the holders of such Bank Cards, all in the manner and on the terms set forth in the Rules or in any Instructions. Merchant agrees not to submit any Sales Slips or Credit Slips which arise from other transactions.

**3. DEFINITIONS.**

**3.1** Account. Account maintained by Merchant pursuant to 4.2.

**3.2** Authorization Center. Any entity operated or designated by the Bank to approve or disapprove Cardholder transactions for the Merchant. PRIOR TO COMMENCEMENT OF OPERATIONS AS PROVIDED IN THIS AGREEMENT THE MERCHANT WILL BE PROVIDED WITH THE NAME, TELEPHONE NUMBER, AND/OR ACCESS CODE OF THE AUTHORIZATION CENTERS WHICH THE MERCHANT IS REQUIRED UNDER THIS AGREEMENT TO CONTACT.

**3.3** Bank Card. A Bank Card means: (a) any MasterCard or any other card approved by MasterCard; (b) any VISA Card or any other card approved by VISA; and (c) any other card designated as a Bank Card by the Bank from time to time.

**3.4** Bank Card Transaction. Any transaction by a Cardholder through the use of a Bank Card.

**3.5** Batch Header. A form supplied by the Bank and completed by the Merchant in connection with depositing sales and credits.

**3.6** Cardholder. A person who has been issued a Bank Card, or any person authorized by the Cardholder to use such card.

**3.7** Credit Slip. A form approved by the Bank and executed as evidence of a refund or price adjustment to be credited to a Cardholder's Bank Card account.

**3.8** Deposit Rules. A publication provided by the Bank setting forth completion, deposit, charge back and other rules which define the additional rights and responsibilities of the Merchant and the Bank regarding their participation in the MasterCard and VISA programs. THE DEPOSIT RULES ARE INCORPORATED BY REFERENCE INTO THIS AGREEMENT AND WILL BE PROVIDED TO THE MERCHANT PRIOR TO COMMENCEMENT OF OPERATIONS AS PROVIDED IN THIS AGREEMENT. The Bank reserves the right to amend the Deposit Rules at any time in accordance with the provisions of 8.12 hereof.

**3.9** MasterCard. A charge card interchange system ("MasterCard Program") honoring and interchanging Bank Cards approved by MasterCard International Incorporated.

**3.10** Operating Guide. A publication provided by the Bank which defines the additional rights and responsibilities of the Merchant and the Bank regarding their participation in the MasterCard and VISA programs. THE OPERATING GUIDE IS INCORPORATED BY REFERENCE INTO THIS AGREEMENT AND THE MERCHANT WILL BE PROVIDED WITH A COPY OF THE OPERATING GUIDE PRIOR TO COMMENCEMENT OF OPERATIONS AS PROVIDED IN THIS AGREEMENT. The Bank reserves the right to amend the Operating Guide at any time in accordance with the provisions of 8.12 hereof.

**3.11** Sales Slip. A form approved by the Bank and executed as evidence of a purchase made by a cardholder through a Bank Card account.

**3.12** Terminal. A device capable of performing the services described in 6 of this Agreement.

**3.13** VISA. A charge card interchange system ("VISA Program") honoring and interchanging Bank Cards approved by VISA U.S.A., Incorporated or Visa International, Inc.

**3.14** Warning List. The Combined Warning Bulletin or any other publication of MasterCard or VISA, respectively, or both which lists card numbers of Bank Card accounts for which transactions may not be processed without approval by the Authorization Center.

**4. RIGHTS AND OBLIGATIONS OF THE MERCHANT.**

**4.1** Honor Bank Cards. The Merchant agrees to honor all valid Bank Cards when properly presented by the Merchant's customers as payment for transactions with the Merchant. If the Merchant does not deal with the public at large (for example, a private club), it agrees to honor Bank Cards of Cardholders who have purchasing privileges with the Merchant.

The Merchant agrees that it will not in any way discriminate against or among customers seeking to make purchases with a Bank Card. The Merchant agrees not to establish minimum or maximum transaction amounts nor post signs indicating that they require minimum or maximum transaction amount as a condition for honoring any Bank Card. Any tax required to be collected by the Merchant must be included in the total transaction amount and not collected separately in cash. The Merchant agrees not to charge any customer for any part of its Merchant discount or to add any other additional amount to a purchase price for Bank Card Transactions. The Merchant agrees not to impose any finance charge, as defined by the federal or State Truth in Lending Act, in connection with any Bank Card transaction. Merchant agrees not to engage in acceptance practices or procedures that discriminates against, or discourages the use of, MasterCard cards in favor of any competing card brand that is also accepted."

**4.1.2** Merchants may not require cardholders to provide personal information, such as a home or business telephone number, a home or business address, or a driver's license for identification as a condition for honoring any MasterCard card or VISA card unless informed by Bank.

**4.2** Maintenance of Deposit Account. The Merchant agrees to maintain at the Bank a deposit account in an amount sufficient to accommodate the fees and charges assessed pursuant to 4.10 and such chargebacks, rejects and remittances as may occur from time to time.

**4.3** Authorization Requirements. The Merchant shall request prior authorization for a transaction involving the use of a Bank Card in accordance with the provisions set forth in the Deposit Rules and the Operating Guide.

**4.4** Sales and Credit Slips. The Merchant agrees that:

**4.4.1** Completion of Sales and Credit Slips. Each Bank Card transaction made by the Merchant shall be evidenced by a Sales Slip completed by the Merchant in accordance with the provisions contained in the Deposit Rules and the Operating Guide. The Merchant agrees that each credit transaction which reverses, in whole or in part, entries previously made will be evidenced by a Credit Slip in accordance with the provisions contained in the Deposit Rules and the Operating Guide.

**4.4.2** Submission of Sales and Credit Slips to the Bank. The Merchant shall present all Sales Slips and Credit Slips to the Bank for processing only those Sales Slips and Credit Slips that originated as a result of a transaction between a Cardholder and the Merchant. Merchant shall not receive any payments from a Cardholder with respect to charges for merchandise or services which are included on a sales draft resulting from the use of a Bank Card. A cash disbursement by a Merchant to a Cardholder is not allowed.

**4.4.3** Records: Bank may examine and verify all records of Merchant relating to transactions generated through the use of Bank Cards. Merchant shall preserve such records for at least one year from the date of each transaction. Electronic Merchants shall preserve records for at least 7 years from the date of each transaction.

**4.4.4** Merchant may limit its acceptance of returned merchandise or establish a policy to make price adjustments for any transaction under conditions of MasterCard and per disclosure shall be governed by MasterCard and Visa rules in force at the time the transaction takes place.

**4.4.5** Merchant shall not use two or more sales drafts originated by the use of a single Card to avoid authorization calls.

**4.4.6** Merchant shall not disclose, sell, purchase, or exchange a cardholder's account information nor other personal information to third parties other than the merchant's agents for the purpose of assisting the merchant in completing the transaction or as specifically required by law. The merchant shall store in an area limited to selected personnel and, prior to discarding, shall destroy in a manner rendering data unreadable, all materials containing cardholder account numbers, card imprints, car rental agreements and carbons.

**4.4.7** The Merchant shall not present records of transactions that it knows or should have known to be fraudulent or not authorized by the cardholder.

**THE TERMS AND CONDITIONS OF THIS AGREEMENT ARE CONTAINED ON BOTH SIDES OF THIS PAGE.**

Processing/Discount Rate

Application/Set Up Fee (Non Refundable) $ _____ (MC/Visa) $ _____ (Amex/ Discover)

Processing/Discount Rate -MasterCard ____ % of Net/Gross (Non-Qualifying)   VISA ____ % of Net/Gross (Non-Qualifying)

Equipment

4.4.8 Merchant is prohibited from re-depositing transactions that have been previously charged back and not re-presented. This prohibition applies with or without the cardholder's consent of the merchant's action.

4.4.9 Merchant may not submit transactions representing refinancing or transfer of an existing cardholder obligation that is deemed to be uncollectible or arising from the dishonor of a cardholder's personal check.

4.5 Unacceptable Cards. The Merchant agrees to retain or retrieve all Bank Cards presented to it that are (a) listed in the most recent edition of the Warning List supplied to the Merchant, (b) requested to be retrieved by the Authorization Center, or (c) requested under the provisions of this Agreement, the Deposit Rules or the Operating Guide ("Unacceptable Cards"). The Merchant agrees to use reasonable and peaceable means to retain or retrieve Unacceptable Cards. Any Unacceptable Cards retained or retrieved or that otherwise may come into the possession of the Merchant shall be cut in half and promptly returned as directed by the Authorization Center.

4.6 Treatment of Credit Slips. The Merchant authorizes the Bank to charge against the Account any amount evidenced by a Credit Slip submitted by the Merchant to the Bank.

4.7 Display Service Marks, Symbols and Names. The Merchant agrees to prominently display the current MasterCard Program and VISA Program Symbols, service marks and names (hereinafter collectively referred to as the "symbols") on promotional materials to inform its customers that Bank Cards are honored by the Merchant. The Merchant further agrees to use only promotional materials which include references to the Merchant's participation in the MasterCard Program or VISA Program if the materials either have been supplied to the Merchant by the Bank or have been approved by the Bank. The symbols of the MasterCard Program and VISA Program may not be used in any other manner by the Merchant without the prior written approval of the Bank. Unrequested by the Bank, the Merchant will make literature and applications for Bank Cards available to the Merchant's customers. The duty to display Master-Card Program and VISA Program symbols, and the duty to make literature available to customers, shall not apply to doctors, dentists, lawyers, or other persons or merchants who do not deal with the public at large, vehicle leasing companies at airport locations, transportation companies subject to federal or foreign regulation and any other classes of merchants which MasterCard or VISA may exempt. Unless the Merchant has entered into an agreement with one or more other member banks of MasterCard or VISA, the Merchant's right and obligation under this Agreement to use and display the above symbols shall terminate upon the earlier of either the termination of this Agreement pursuant to Section 8.9 hereof, or upon notification from the Bank. MasterCard or VISA to discontinue such use or display.

4.8 Compliance with Laws, Deposit Rules, and Operating Guide. The Merchant agrees to comply with (i) all federal, state and local laws, regulations and ordinances applicable to its dealings with Cardholders as contemplated by this Agreement, and (ii) the provisions of the Rules, the Deposit Rules, Operating Guide, the Instructions, and (iii) any and all other reasonable rules or instructions as may be provided and/or required from time to time by the Bank to the Merchant.

4.8.1 Merchant understands that processing/discount rate is conditional upon the merchant meeting certain requirements of Visa and MasterCard rules for processing, including but not limited to, time limits for depositing transactions, the processing of authorizations, and "swiping" of magnetic stripes.

4.8.2 Merchant acknowledges that this agreement may include additional addenda as required from time to time by MasterCard and Visa.

4.8.3 Merchant acknowledges that Bank is required to report merchants whose agreement is terminated by the Bank for certain reasons including, but not limited to, conviction of credit card fraud, depositing of excessive counterfeit transactions, depositing transactions representing the sale of goods or services generated by another merchant, an excessive number of chargebacks due to Merchant's business practices or procedures, bankruptcy, or any violation of the Merchant Agreement, to the Combined Terminated Merchant File (CTMF) maintained by MasterCard and Visa and that reporting to the CTMF may affect future merchant banking relationships.

4.9 Merchant Warranties to Bank. With respect to each Bank Card transaction, the Merchant warrants to MasterCard, VISA and the Bank as follows:

4.9.1 The Merchant warrants the true identity of the Cardholder. The fact that the Merchant has obtained authorization for the transaction does not alter such warranty of identity.

4.9.2 The Merchant warrants that the signature on the Sales Slip compares favorably with that on the Bank Card. The Merchant also warrants that in all respects each Sales Slip is generally what it purports to be and complies with this Agreement, the Rules, the Operating Guide, the Deposit Rules and the Instructions.

4.9.3 The Merchant warrants that it has no knowledge or reason to suspect any fact or circumstance that would impair the validity of the transaction evidenced by the Sales Slip.

4.9.4 The Merchant warrants that it had the right to sell the goods and/or furnish the services described in the Sales Slip free from all liens and encumbrances and that at the time of the sale, any goods sold were owned by the Merchant or held by the Merchant for sale under a consignment agreement.

4.9.5 The Merchant warrants that the transaction complied with all applicable laws, regulations and ordinances.

4.9.6 The Merchant warrants that the goods and/or services were delivered and/or performed and accepted by the Cardholder named in the Sales Slip.

4.10 Fees; Assessment Charges. The Merchant agrees to pay such fees and assessment charges as are set forth in this Agreement. The Merchant authorizes the Bank to debit the Account for all charges due under this Agreement; provided, however, that the Merchant Application Fee and the Imprinter fee shall be due and payable by check at the time this Agreement is executed by the Merchant.

4.11 Selection of Member Banks. In the event the Merchant has entered into an agreement with one or more other member banks of MasterCard or VISA, (a) the Merchant shall have the right to select the member through which the Merchant will process each transaction, however, the Merchant agrees that no further negotiation by the Bank under this Agreement shall be used by the Merchant to process transactions with any other member, and (b) the Bank shall not be required to process any Credit Slips submitted by the Merchant if the Bank did not process the Sales Slip related to the transaction.

4.12 Merchant Identity. The Merchant shall give the Bank prior written notice in the event of a change in the Merchant's name, identity, or if a corporation, its corporate structure. In connection with any such change, the Merchant shall execute and deliver to the Bank all such additional Bank Card Merchant Application and Agreements and other documents as the Bank shall reasonably require, provided, however, if there shall occur such a change, the Bank hereby reserves its right to terminate this Agreement in accordance with the provisions of Section 8.9 hereof.

## 5. RIGHTS AND OBLIGATIONS OF THE BANK.

5.1 Imprinters. Upon request by the Merchant, the Bank shall supply the Merchant with suitable imprinters for the service fee per imprinter set forth in this Agreement. The service fee shall be payable in advance and is refundable only if Merchant's application is not approved by the Bank. All imprinters shall remain the property of the Bank and shall be returned to the Bank upon termination of this Agreement in the same condition as when received, reasonable wear and tear only excepted.

5.2 Forms. Upon reasonable request by the Merchant, the Bank will supply the Merchant with Sales Slips, Credit Slips, Batch Headers, and Merchant Deposit envelopes to be used by the Merchant in connection with this Agreement.

5.3 Charge Backs. The Bank has the right to charge back to the Merchant, by debiting the Account, any Bank Card Transaction as provided in the applicable rules and regulations of the MasterCard and VISA programs.

5.4 Treatment of Sales Slips. Except as set forth below, for any Sales Slip completed by the Merchant (a) at the time of a Bank Card transaction, (b) in accordance with the requirements contained in the Deposit Rules and in the Operating Guide, and (c) delivered to the Bank on any of the Bank's regular business days through regular banking channels, the Bank will credit Merchant's Account for each Sales Slip or will credit the Merchant as otherwise agreed by the Merchant and the Bank, unless a commercially reasonable time. The Bank may refuse to give credit for any Sales Slip that does not conform in every respect to the requirements contained in this Agreement, the Rules, the Deposit Rules, and the Operating Guide.

## 6. TERMINAL.

6.1 If the Merchant meets the qualifications established from time to time by the Bank, the Bank agrees to deliver to the Merchant a premises the number of Terminals, if any, requested by the Merchant. Upon the Merchant's request and at its option, the Bank agrees to install the Terminals and to pay to the Bank the installation fee and all Terminal service fees set forth in this Agreement which fees shall be deducted from the Account. If the Bank does not install the Terminals, the Bank agrees to offer reasonable assistance to the Merchant regarding installation of the Terminals.

6.2 Merchant acknowledges that upon payment of the terminal fee to the Bank, the Terminals are, for all intent and purpose, the property of the Merchant.

6.2.1 (i) If Leased: Merchant acknowledges that the Terminals are, for all intent and purpose, the property of the Bank and the Merchant has no claim to the title of the property.

6.3 The Bank agrees, at its expense, to repair or replace any Terminal which fails or becomes inoperative, solely because of a defect in the Terminal. All other Terminals which fail or become inoperative shall be repaired or replaced at the Merchant's expense.

6.4 Merchant shall assume the risk of loss for all Terminals resulting from any cause including, but not limited to, fire, flood or other catastrophes; acts of God, insurrection, war, or risks.

6.5 If the services relating to the Terminals are terminated for any reason, the Bank shall, within a reasonable time after written request to the Merchant, remove all Terminals installed or located on the Merchant's premises. If the services relating to the Terminals are terminated by the Merchant for any reason other than for a breach of the provisions of the Agreement by the Bank, the Merchant shall bear the costs of removing the Terminals; otherwise, the Bank shall be responsible for such costs.

6.6 Liability. The Bank shall not be liable or responsible for any errors, delays, equipment malfunctions or failures, or any other acts or omissions by it except where it has failed to act in good faith. Without limiting the generality of the foregoing, the Bank shall not be liable or responsible for any loss, delays, or errors occurring by reason of circumstances beyond its control including acts of civil, military or banking authorities, national emergencies, labor difficulties, failure of transportation, communication or power supplies or malfunctions of or unavoidable difficulties with equipment. If the Bank is adjudged liable to the Merchant for any reason, the amount of damages recoverable by the Merchant shall not exceed the Merchant's actual damages but in no event shall include consequential damages, exemplary damages or lost profits. In any event, such actual damages shall not exceed an amount equal to the total fees and charges paid by the Merchant to the Bank for services relating to Terminals during the twelve (12) month period immediately preceding the event giving rise to the Bank's liability. THE BANK MAKES NO REPRESENTATION OR WARRANTIES, EXPRESSOR IMPLIED, EITHER AS TO MERCHANTABILITY, SUITABILITY FOR A PARTICULAR PURPOSE, OR IN ANY MANNER WHATSOEVER, CONCERNING THE PERFORMANCE OR OPERATION OF THE SERVICES, THE TERMINALS OR ANY OTHER PORTION OF THIS AGREEMENT.

## 7. INDEMNIFICATION.

The Merchant shall indemnify and hold harmless the Bank from and against any and all costs, losses, damages, attorneys' fees or other liabilities or expenses by reason of or in consequence of any claim arising out of the provision of or from any violation by the Merchant of or any failure by the Merchant to comply with any regulation or with any provisions of this Agreement, the Rules, the Operating Guide, the Deposit Rules, and will reimburse the Bank for any legal and any other expenses reasonably incurred in connection with investigating of defending any such loss, damage, claim or liability. The Bank shall give notice to the Merchant within reasonable time period after the Bank has actual knowledge of any claim as to which indemnity may be sought, and the Merchant shall assume the defense of any claim in any litigation resulting therefrom, provided that counsel for the Merchant who shall conduct the defense of such claim or litigation shall be satisfactory to the Bank, and the Bank may participate in such defense at its expense. The Merchant shall not, in the defense of any such claim or litigation, except with the prior written consent of the Bank, consent to entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to the Bank of a release from all liability in respect to such claim or litigation. The reimbursement required by this section shall be made by periodic payments during the course of the investigation or defense, as and when bills are received, costs or expenses incurred.

## 8. GENERAL CONDITIONS.

8.1 Interest. Any and all unpaid amounts due hereunder shall bear interest, payable on demand, at a fluctuating interest rate per annum equal to _____ percentage points above the Wall Street Journal Prime Rate, adjusted as hereinafter set forth. Such interest rate shall be adjusted as of the first day of each calendar month to reflect the Wall Street Journal Prime Rate in effect on the last day of the preceding month. "Wall Street Journal Prime Rate" shall mean the base rate on corporate loans at large money center commercial banks for the average of such rates, if there is more than one such rate) as reported in the Wall Street Journal. Interest shall be calculated on the basis of actual days elapsed and a 360-day year.

8.2 Collateral and Set-off. Any deposits or other sums at any time credited by or due from the Bank to the Merchant, and any securities or other property of the Merchant or any guarantor at any time in the possession of the Bank may at all times be held and treated as collateral for the payment of amounts due hereunder and any and all liabilities (direct or indirect, absolute or contingent, sole, joint or several, secured or unsecured, due or to become due, now existing or hereafter arising) of the Merchant to the Bank. Regardless of the adequacy of collateral, the Bank may apply or set-off such deposits or other sums against such liabilities at any time in the case of the Merchant but only with respect to matured liabilities in the case of any guarantor.

8.3 Waiver. The Merchant and any guarantor hereby waive presentment, demand, protest or notice of dishonor, notice of failure or delay in performance, default or enforcement of this and collateral due to nonperformance, failure to enforce or collect, and no waiver granting of indulgence or waiver of or failure of any party promptly or successfully liable herein, shall discharge or otherwise affect the liability of the Merchant or any guarantor. No delay or omission for the part of the Bank in exercising any right hereunder shall operate as a waiver of such right or of any other right hereunder, and a waiver of any right on any one occasion shall not be construed as a bar to or waiver of any right.

The undersigned Merchant understands that the Bank is a member of MasterCard International Incorporated ("MasterCard") which operates a bank card plan pursuant to which MasterCard cards are issued by member banks of MasterCard to selected persons who desire to avail themselves of the programs, services and credit facilities of such bank card plan and/or of VISA, USA, INC. ("VISA") which operates a bank card plan pursuant to which VISA Cards and other Qualified Cards, as defined in VISA's Operating Regulations, are issued by member banks of VISA to selected persons who desire to avail themselves of the programs, services and credit facilities of such bank card plan and that the Bank is authorized to enter into agreements with merchants. The MasterCard bank card plan and the VISA bank card plan are collectively referred to as the "Bank Card Plans" and the MasterCard cards and VISA and other Qualified Cards are collectively referred to as "Bank Cards". The Rules of MasterCard and the Regulations of VISA are collectively referred to as the "Rules". Merchant desires to participate in and obtain the benefits of one or both of the Bank Card Plans as indicated by check mark at the beginning of this Agreement. If Merchant's application is approved by the Bank, and the Bank agree as follows:

**1. ADMINISTRATION OF BANK CARD PLANS.** Merchant understands that the Bank Card Plans are administered by MasterCard and VISA which have each adopted Rules which are binding on the Bank and other member banks of MasterCard and VISA. Merchant agrees to comply with such Rules so far as they pertain to the Merchant, and such Rules as now in effect and as amended from time to time are hereby made a part of this Agreement as fully as if specifically set forth herein. Merchant understands that the Bank has made arrangements with NEW ENGLAND BANKCARD ASSOCIATION INC. ("NEBA") under which NEBA will perform certain authorization, bookkeeping and other services (facilitating Bank's participation in the Bank Card Plans. Merchant agrees to comply with the Operating Rules of NEBA as now in effect and as amended from time to time and with any instructions issued by MasterCard, VISA, NEBA or the Bank governing honoring of Bank Cards, authorization procedures, preparation and presentation of sales drafts and credit vouchers, acceptance of chargebacks to the Merchant and other aspects of the Merchant's participation in the Bank Card Plans (such Operating Rules and instructions being collectively referred to as "Instructions"). Any such Instructions issued from time to time are hereby made a part of this Agreement as fully as if specifically set forth herein.

**2. MUTUAL UNDERTAKINGS.** Merchant agrees to honor Bank Cards issued by any member bank of MasterCard and/or VISA, as indicated by check mark at the beginning of this agreement, all in a manner and on the terms set forth in the Rules or in any Instructions. Bank agrees to accept from the Merchant Sales Slips and Credit Slips generated through the use of such Bank Cards and arising from transactions between the Merchant and the holders of such Bank Cards, all in the manner and on the terms set forth in the Rules or in any Instructions. Merchant agrees not to submit any Sales Slips or Credit Slips which arise from other transactions.

**3. DEFINITIONS.**
3.1 Account. Account maintained by Merchant pursuant to 4.2.
3.2 Authorization Center. Any entity operated or designated by the Bank to approve or disapprove Cardholder transactions for the Merchant. PRIOR TO COMMENCEMENT OF OPERATIONS AS PROVIDED IN THIS AGREEMENT THE MERCHANT WILL BE PROVIDED WITH THE NAME, TELEPHONE NUMBER, AND/OR ACCESS CODE OF THE AUTHORIZATION CENTERS WHICH THE MERCHANT IS REQUIRED UNDER THIS AGREEMENT TO CONTACT.
3.3 Bank Card. A Bank Card means: (a) any MasterCard Card or any other card approved by MasterCard; (b) any VISA Card or any other card approved by VISA; and (c) any other card designated as a Bank Card by the Bank from time to time.
3.4 Bank Card Transaction. Any transaction by a Cardholder through the use of a Bank Card.
3.5 Batch Header. A form supplied by the Bank and completed by the Merchant in connection with depositing sales and credits.
3.6 Cardholder. A person who has been issued a Bank Card, or any person authorized by the Cardholder to use such card.
3.7 Credit Slip. A form approved by the Bank and executed as evidence of a refund or price adjustment to be credited to a Cardholder's Bank Card account.
3.8 Deposit Rules. A publication provided by the Bank setting forth completion, deposit, charge back and other rules which define the additional rights and responsibilities of the Merchant and the Bank regarding their participation in the MasterCard and VISA programs. THE DEPOSIT RULES ARE INCORPORATED BY REFERENCE INTO THIS AGREEMENT AND WILL BE PROVIDED TO THE MERCHANT PRIOR TO COMMENCEMENT OF OPERATIONS AS PROVIDED IN THIS AGREEMENT. The Bank reserves the right to amend the Deposit Rules at any time in accordance with the provisions of 8.12 hereof.
3.9 MasterCard. A charge card interchange system ("MasterCard Program") honoring and interchanging Bank Cards approved by MasterCard International Incorporated.
3.10 Operating Guide. A publication provided by the Bank which defines the additional rights and responsibilities of the Merchant and the Bank regarding their participation in the MasterCard and VISA programs. THE OPERATING GUIDE IS INCORPORATED BY REFERENCE INTO THIS AGREEMENT AND THE MERCHANT WILL BE PROVIDED WITH A COPY OF THE OPERATING GUIDE PRIOR TO COMMENCEMENT OF OPERATIONS AS PROVIDED IN THIS AGREEMENT. The Bank reserves the right to amend the Operating Guide at any time in accordance with the provisions of 8.12 hereof.
3.11 Sales Slip. A form approved by the Bank and executed as evidence of a purchase made by a cardholder through a Bank Card account.
3.12 Terminal. A device capable of performing the services described in 6 of this Agreement.
3.13 VISA. A charge card interchange system ("VISA Program") honoring and interchanging Bank Cards approved by VISA U.S.A., Incorporated or Visa International, Inc.
3.14 Warning List. The Combined Warning Bulletin or any other publication of MasterCard and VISA, respectively, or both which lists card numbers of Bank Card accounts for which transactions may not be processed without approval by the Authorization Center.

**4. RIGHTS AND OBLIGATIONS OF THE MERCHANT.**
4.1 Honor Bank Cards. The Merchant agrees to honor all valid Bank Cards when properly presented by the Merchant's customers as payment for transactions with the Merchant. If the Merchant does not deal with the public at large (for example, a private club), it agrees to honor Bank Cards of Cardholders who have purchasing privileges with the Merchant.

The Merchant agrees that it will not in any way discriminate against or among customers seeking to make purchases with a Bank Card. The Merchant agrees not to establish minimum or maximum transaction amounts nor post signs indicating that they require minimum or maximum transaction amount as a condition for honoring any Bank Card. Any tax required to be collected by the Merchant must be included in the total transaction amount and not collected separately in cash. The Merchant agrees not to charge any customer for any part of its Merchant discount or to add any other additional amount to a purchase price for Bank Card Transactions. The Merchant agrees not to impose any finance charge, as defined by the federal or State Truth in Lending Act, in connection with any Bank Card transaction. Merchant agrees not to engage in acceptance practices or procedures that discriminate against, or discourages the use of, MasterCard cards in favor of any competing card brand that is also accepted."
4.1.2 Merchants may not require cardholders to provide personal information, such as a home or business telephone number, a home or business address, or a driver's license for identification as a condition for honoring any MasterCard or VISA card unless informed by Bank.
4.2 Maintenance of Deposit Account. The Merchant agrees to maintain at the Bank a deposit account in an amount sufficient to accommodate the fees and charges assessed pursuant to 4.10 and such chargebacks, rejects and remittances as may occur from time to time.
4.3 Authorization Requirements. The Merchant shall request prior authorization for a transaction involving the use of a Bank Card in accordance with the provisions set forth in the Deposit Rules and the Operating Guide.
4.4 Sales and Credit Slips. The Merchant agrees that:
4.4.1 Completion of Sales and Credit Slips. Each Bank Card transaction made by the Merchant shall be evidenced by a Sales Slip completed by the Merchant in accordance with the provisions contained in the Deposit Rules and the Operating Guide. The Merchant agrees that each credit transaction which reverses, in whole or in part, entries previously made will be evidenced by a Credit Slip in accordance with the provisions contained in the Deposit Rules and the Operating Guide.
4.4.2 Submission of Sales and Credit Slips to the Bank. The Merchant shall present all Sales Slips and Credit Slips to the Bank in accordance with the provisions of the Deposit Rules. The Merchant agrees to present to the Bank for processing only those Sales Slips and Credit Slips that originated as a result of a transaction between a Cardholder and the Merchant. A Merchant shall not receive any payments from a Cardholder with respect to charges for merchandise or services which are included on a sales draft resulting from the use of a Bank Card. A cash disbursement by a Merchant to a Cardholder is not allowed.
4.4.3 Records. Merchant may examine and verify all records of Merchant relating to transactions generated through the use of Bank Cards. Merchant shall preserve such records for at least one year from the date of each transaction. Electronic Merchants shall preserve records for at least 7 years from the date of each transaction.
4.4.4 Merchant may limit its acceptance of returned merchandise or establish a policy to make price adjustments for any transaction under conditions of MasterCard and per disclosure shall be governed by MasterCard and Visa rules in force at the time the transaction takes place.
4.4.5 Merchant shall not use two or more sales drafts originated by the use of a single card to avoid authorization calls.
4.4.6 Merchant shall not disclose, sell, purchase, or exchange a cardholder's account information nor other personal information to third parties other than the merchant's agents for the purpose of assisting the merchant in completing the transaction or as specifically required by law. The merchant shall store in an area limited to selected personnel and, prior to discarding, shall destroy in a manner rendering data unreadable, all materials containing cardholder account numbers, card imprints, car rental agreements and carbons.
4.4.7 The Merchant shall not present records of transactions that it knows or should have known to be fraudulent or not authorized by the cardholder.

**THE TERMS AND CONDITIONS OF THIS AGREEMENT ARE CONTAINED ON BOTH SIDES OF THIS PAGE.**

**Processing/Discount Rate**

Application/Set Up Fee (Non Refundable) : $ _____ (MC/Visa) $ _____ (Amex/ Discover)

Processing/Discount Rate - MasterCard **2.86** % of Net/Gross Sales    VISA **2.86** % of Net/Gross Sales

MasterCard _____ % of Net/Gross (Non-Qualifying)    VISA _____ % of Net/Gross (Non-Qualifying)

**Equipment**

Imprinter $ _____ Service Fee for Imprinter  Terminal $ _____ Per unit  Installation $ _____ Per Terminal

Printer $ _____ Per Unit $

**Per Ticket**

MasterCard _____ ¢ per transaction  VISA _____ ¢ per transaction  Other: _____ ¢ per transaction

**Authorizations**

BankCards - MasterCard **60 Void** ¢ per transaction  AMEX, Carte Blanche, Diners Club & Check Warranty **20** ¢ per transaction

VISA card **60 Void** ¢ per transaction

Other Service: **Monthly Fee**  Fee: $ **5.00**

**Chargeback Fee**  Fee: $ **15.00**

**Annual Fee (January)**  Fee: $ **25.00**

IN WITNESS WHEREOF, the Merchant and the Bank have executed this Agreement in duplicate as of the date last written below.

FOR MERCHANT

By: _____ By: _____

Owner/Corporate Officer    Authorized Bank Official

4.8.1 Merchant understands that processing/discount rate is conditional upon the merchant meeting certain requirements of Visa and MasterCard rules for processing, including but not limited to, time limit for depositing transactions, the processing of authorizations, and "swiping" of magnetic stripes.

4.8.2 Merchant acknowledges that this agreement may include additional addenda as required from time to time by MasterCard and Visa.

4.8.3 Merchant acknowledges that bank is required to report merchants whose agreement is terminated by the Bank for certain reasons including, but not limited to, conviction of credit card fraud, depositing of excessive counterfeit transactions, depositing transactions representing the sale of goods or services generated by another merchant, an excessive number of chargebacks due to Merchant's business practice or procedures, bankruptcy, or any violation of the Merchant Agreement, to the Combined Terminated Merchant File (CTMF) maintained by MasterCard and Visa and their reporting to the CTMF may affect future merchant banking relationships.

4.9 Merchant Warranties to Bank. With respect to each Bank Card transaction, the Merchant warrants to MasterCard, VISA and the Bank as follows:

4.9.1 The Merchant warrants the true identity of the Cardholder. The fact that the Merchant has obtained authorization for the transaction does not alter such warranty of identity.

4.9.2 The Merchant warrants that the signature on the Sales Slip compares favorably with that on the Bank Card. The Merchant also warrants that in all respects each Sales Slip is generally what it purports to be and complies with this Agreement, the Rules, the Operating Guide, the Deposit Rules and the Instructions.

4.9.3 The Merchant warrants that it has no knowledge or reason to suspect any fact or circumstance that would impair the validity of the transaction evidenced by the Sales Slip.

4.9.4 The Merchant warrants that it had the right to sell the goods and/or furnish the services described in the Sales Slip free from all liens and encumbrances and that at the time of the sale, any goods sold were owned by the Merchant or held by the Merchant for sale under a consignment agreement.

4.9.5 The Merchant warrants that the transaction complied with all applicable laws, regulations and ordinances.

4.9.6 The Merchant warrants that the goods and/or services were delivered and/or performed and accepted by the Cardholder named in the Sales Slip.

4.10 Fees; Assessment Charges. The Merchant agrees to pay such fees and assessment charges as are set forth in this Agreement. The Merchant authorizes the Bank to debit the Account for all charges due under this Agreement; provided, however, that the Merchant Application Fee and the imprinter fee shall be due and payable by check at the time this Agreement is executed by the Merchant.

4.11 Selection of Member Banks. In the event the Merchant has entered into an agreement with one or more other member banks of MasterCard or VISA, (a) the Merchant shall have the right to select the merchant through which the Merchant will process each transaction, however, the Merchant agrees that no forms supplied by the Bank under this Agreement shall be used by the Merchant to process transactions with any other member, and (b) the Bank shall not be required to process any Credit Slip submitted by the Merchant if the Bank did not process the Sales Slip related to the transaction.

4.12 Merchant Identity. The Merchant shall give the Bank prior written notice in the event of a change in the Merchant's name, identity, or if a corporation, its corporate structure. In connection with any such change, the Merchant shall execute and deliver to the Bank all such additional Bank Card Merchant Application and Agreements and other documents as the Bank reasonably require, provided, however, if there shall occur such a change, the Bank hereby reserves its rights to terminate this Agreement in accordance with the provisions of Section 8.9 hereof.

## 5. RIGHTS AND OBLIGATIONS OF THE BANK.

5.1 Imprinters. Upon request by the Merchant, the Bank shall supply the Merchant with suitable imprinters for the service fee per imprinter set forth in this Agreement. The service fee shall be payable in advance, and is refundable only if Merchant's application is not approved by the Bank. All imprinters shall remain the property of the Bank and shall be returned to the Bank upon termination of this Agreement, in the same condition as when received, reasonable wear and tear only excepted.

5.2 Forms. Upon reasonable request by the Merchant, the Bank will supply the Merchant with Sales Slips, Credit Slips, Batch Headers, and Merchant Deposit envelopes to be used by the Merchant in connection with this Agreement.

5.3 Charge Backs. The Bank has the right to charge back to the Merchant, by debiting the Account, any Bank Card Transaction, as provided in the applicable rules and regulations of the MasterCard and VISA programs.

5.4 Treatment of Sales Slips. Except as set forth below, for any Sales Slip submitted by the Merchant, (a) in the Bank Card transaction, (b) in accordance with the requirements contained in the Deposit Rules and in the Operating Guide, and (c) delivered to the Bank on any of the Bank's regular business days (Monday-Friday, except holidays), the Bank will credit Merchant's Account for such Sales Slip or will credit the Merchant as otherwise agreed by the Merchant and the Bank, within a commercially reasonable time. The Bank may refuse to give credit for any Sales Slip that does not conform in every respect to the requirements contained in this Agreement, the Rules, the Deposit Rules, and the Operating Guide.

## 6. TERMINAL.

6.1 If the Merchant meets the qualifications established from time to time by the Bank, the Bank agrees to deliver to the Merchant's premises the number of Terminals, if any, requested by the Merchant. Upon the Merchant's request and at its option, the Bank agrees to install the Terminals and the Merchant agrees to pay to the Bank the installation fee and all Terminal service fees set forth in this Agreement which fees shall be deducted from the Account. If the Bank does not install the Terminals, the Bank agrees to offer reasonable assistance to the Merchant regarding installation of the Terminals.

6.2 Merchant acknowledges that upon payment of the terminal fee to the Bank, the Terminals are, for all intent and purpose, the property of the Merchant.

6.2.1 [ ] If Leased; Merchant acknowledges that the Terminals are, for all intent and purpose, the property of the Bank and the Merchant has no claim to the title of the property.

6.3 The Bank agrees, at its expense, to repair/or replace any Terminal which fails or becomes inoperative, only because of a defect in the Terminal. All other Terminals which fail or become inoperative shall be repaired or replaced at the Merchant's expense.

6.4 Merchant shall assume the risk of loss for all Terminals resulting from any cause including, but not limited to, fire, flood or other catastrophies, acts of God, insurrection, war, or riots.

6.5 If the services relating to the Terminals are terminated for any reason, the Bank shall, within a reasonable time after written request thereto Merchant, remove all Terminals installed or located on the Merchant's premises. If the services relating to the Terminals are terminated by the Merchant for any reason other than for a breach of this Agreement by the Bank, the Merchant shall bear the costs of removing the Terminals; otherwise, the Bank shall bear the costs of removing the Terminals.

6.6 Liability. The Bank shall not be liable for any errors, delays, computation/malfunctions or failures, or any other acts or omissions by it except where it has failed to act in good faith. Without limiting the generality of the foregoing, the Bank shall not be liable or responsible for any loss, delays or errors occurring by reason of circumstances beyond its control including acts of civil, military or banking authorities, national emergencies, labor difficulties, failure of transportation, communication or power supply, or malfunction of or unavoidable difficulties with equipment. If the Bank is adjudged liable to the Merchant for any reason, under the amount of damages recoverable by the Merchant shall not exceed the Merchant's actual damages and in no event shall include consequential damages, exemplary damages or lost profits. In any event, such actual damages shall not exceed an amount equal to the total fees and charges paid by the Merchant to the Bank for services relating to Terminals during the twelve (12) month period immediately preceding the event giving rise to the Bank's liability. THE BANK MAKES NO REPRESENTATION OR WARRANTIES, EXPRESSOR IMPLIED, EITHER AS TO MERCHANTABILITY, SUITABILITY FOR A PARTICULAR PURPOSE, OR IN ANY MANNER WHATSOEVER, CONCERNING THE PERFORMANCE OR OPERATION OF THE SERVICES, THE TERMINALS OR ANY OTHER PORTION OF THIS AGREEMENT.

## 7. INDEMNIFICATION.

The Merchant shall indemnify and hold harmless the Bank from and against any and all costs, losses, damages, attorneys' fees or other liabilities or expenses by reason of or in consequence of any claim arising out of the provision of or from any violation by the Merchant of or any failure by the Merchant to comply with applicable law or regulation or with any provision of this Agreement, the Rules, the Operating Guide, the Deposit Rules, and will reimburse the Bank for any legal and any other expenses reasonably incurred in connection with investigating or defending any such loss, damage, claim or liability. The Bank shall give notice to the Merchant within reasonable time period after the Bank has actual knowledge of any claim as to which indemnity may be sought, and the Merchant shall promptly assume the defense thereof, provided that counsel for the Merchant who shall conduct the defense of such claim or litigation shall be satisfactory to the Bank, and the Bank may participate in such defense at its expense. The Merchant shall not, in the defense of any such claim or litigation, except with the prior written consent of the Bank, consent to entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving to the claimant or plaintiff by the Bank of a release from all liability in respect to such claim or litigation. The reimbursement required by this section shall be made by periodic payments during the course of the investigation or defense, as and when bills are received or expenses incurred.

## 8. GENERAL CONDITIONS.

8.1 Interest. Any and all unpaid amounts due hereunder shall bear interest, payable on demand, at a fluctuating interest rate per annum equal to _____ percentage points above the Wall Street Journal Prime Rate, adjusted as hereinafter set forth. Such interest rate shall be adjusted as of the first day of each calendar month to reflect the Wall Street Journal Prime Rate in effect on the last day of the preceding month. "Wall Street Journal Prime Rate" shall mean the base rate on corporate loans at large money center commercial banks for the average of such rates, if there is more than one—reduced as imposed in the Wall Street Journal. Interest shall be calculated on the basis of an actual days elapsed and a 360-day year.

8.2 Collateral and Set-off. Any deposits or other sums at any time credited by or due from the Bank to the Merchant, or any guarantor hereof and any securities or other property of the Merchant or any guarantor at any time in the possession of the Bank may at all times be held and treated as collateral for the payment of amounts due hereunder and any and all liabilities (direct or indirect, absolute or contingent) sole, joint or several, secured or unsecured, due or to become due, now existing or hereafter arising) of the Merchant to the Bank. Regardless of the adequacy of collateral, the Bank may apply or set-off such deposits or other sums against such liabilities as it may in the case of the Merchant but only with respect to matured liabilities in the case of any guarantor.

8.3 Waiver. The Merchant and any guarantor hereof hereby waive presentment, demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement hereof and consent that no indulgence, and no substitution, release or surrender of collateral, and no discharge or release of any other party primarily or secondarily liable hereon, shall discharge or otherwise affect the liability of the Merchant or any guarantor. No delay or omission on the part of the Bank in exercising any right hereunder shall operate as a waiver of such right or of any other right hereunder, and a waiver of any such right on any one occasion shall not be construed as a bar to or waiver of any such right on any future occasion.

8.4 Security. The performance and fulfillment of all obligations, liabilities and undertakings of the Merchant to the Bank hereunder are secured by any and all collateral at any time granted to the Bank to secure any obligations of the Merchant hereof.

8.5 Holdback. Should the Bank have reasonable basis for concern as to the existence of undeclared amounts of chargebacks and the possibility that the Bank may not properly be reimbursed for same, the Bank may, in its sole discretion, retain proceeds for the satisfaction of amounts charged back.

8.6 Notices. Any notice required or permitted to be given under this Agreement may be given in writing by depositing such notice in the United States mail, postage prepaid, addressed to the appropriate party at the address indicated above, or to such other place or places as either party hereto shall designate by written notices to the other. The Merchant agrees to waive notice of default or nonpayment, protest or notice of protest, demand for payment and other demands or notices in connection with this Agreement or any Sales Slip. The Merchant agrees, in present to extensions of time granted to, or compromises made with, any holder of a Bank Card who is liable on any transaction. Any such extension or compromises shall not affect any liability of the Merchant on or under any Sales Slip, Credit Slip or under this Agreement.

8.7 Confidential Information. The Merchant agrees not to permit any customer to talk to the Authorization Center, whether managed by the Bank, MasterCard, VISA or any other person, and shall not divulge to any customer the authorization telephone numbers and/or access codes to the Bank, MasterCard or VISA.

8.8 Independent Contractors. The Bank and the Merchant are independent contractor, and nothing contained in this Agreement shall be deemed to constitute either the Bank or the Merchant as agent, joint venturer, partner or employee of the other.

8.9 Term and Termination. This Agreement may be terminated by either party at any time, including without limitation, upon a change in management or control of the Merchant, which in the Bank's sole opinion is material or upon any material adverse change in the Merchant's condition, financial or otherwise, upon written notice to the other party setting forth the effective date of termination. Unless the Merchant has control into an agreement with one or more other member banks of MasterCard or VISA, from and after such termination date, the Merchant shall cease accepting Bank Cards and shall cease displaying the symbols described in 4.7 of this Agreement. The Merchant agrees to promptly return to the Bank all forms, advertising materials, instructions, imprinters, and the Merchant plates provided by the Bank. All obligations of the Merchant incurred or existing under this Agreement as of the date of termination shall survive such termination, including, without limitation, any continuing obligation by the Bank. All obligations of the Merchant incurred or existing under this Agreement as of the date of termination shall survive such termination, including, without limitation, any continuing obligation with respect to chargebacks.

8.10 Entire Agreement. This Agreement shall constitute the entire agreement of the parties with respect to the subject matter hereof.

8.11 Assignment. The Merchant may not assign this Agreement. The Bank reserves the right to assign this Agreement to any of its affiliates or subsidiaries and to delegate any of its duties under this Agreement. This Agreement shall be binding upon the successors and assigns of the Bank and upon the successors of the Merchant.

8.12 Amendment. The Bank may amend this Agreement at any time by giving notice to the Merchant. Any amendment shall become effective not less than fifteen (15) days in advance of the effective date of such amendment; provided, however, that the Bank may, without advance notice and immediately, amend anything to the contrary in this Agreement, amend the fees set forth in this Agreement to the extent the amendment results from changes in fees incurred by the Bank with respect to the services provided. Notwithstanding the foregoing, the Bank reserves the right to amend this Agreement, the Operating Guide and the Deposit Rules at any time to comply with applicable statutory or regulatory requirements, such amendment to be effective immediately.